[No. 20029-5-II.    Division Two.    September 2, 1997.]

JAN SCHMALENBERG, ET AL., *Appellants*, v. TACOMA
NEWS, INC., *Respondent*.

*Herbert Gelman* and *Gelman & Associates (Charles O. Morgan,* of counsel), for appellants.

*J. Richard Creatura, William E. Holt,* and *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim,* for respondent.

MORGAN, J. — Jan Schmalenberg, his wife Barbara Schmalenberg, and a limited partnership called Tri-Park Associates (collectively "the Schmalenbergs") sued the Tacoma News Tribune (Tribune) for defamation. The trial court granted a defense motion for summary judgment, and this appeal followed. We affirm.

In 1991 and 1992, the Schmalenbergs were planning and developing a 21-unit, long-term shelter for battered women. The shelter opened for business in February 1993. Called the Tri-Park Apartments, it was located in Tacoma, next door to a topless nightclub called Fox's. It opened without an on-site manager or other on-site staff.

On Sunday, July 25, 1993, the Tacoma News Tribune published a story about the shelter. The story began on the front page and continued on the back page of the first section. The front-page headline read, "Dream to Debacle." The back-page headline read, "YWCA pulled support before project even opened its doors." The theme of the story was that the shelter, before opening, had been heralded as a model resource for battered women; as actu-

ally operated, however, the shelter was a disappointment. It was exposing residents and their children to drugs and violence, affording little security against abusive boyfriends and husbands (for example, its security gate was frequently broken or left unlocked), and failing to supply resources such as counseling, day care, or an adequate playground for its 33 resident children. It was charging more rent than landlords offering apartments through classified ads, even though it was meant to be accessible to low-income battered women. In the planning stages, it had been supported by the YWCA, but even before opening it had lost that support.

The story attributed various statements to Curtis Benson, the Pierce County Sheriff's public information officer. Those statements said, in essence, that the shelter was negligently run, provided little security, and left its residents exposed to crime.

The story attributed certain statements to Sallie Sweet, then the director of multifamily programs for the Housing Finance Commission. Those statements said, in essence, that the shelter had serious problems, and that she and the Schmalenbergs were working to find new management for its day-to-day operations.

The story attributed to YWCA "officials" a statement that the shelter was too expensive and too dangerous, and to Venetia Magnuson, the YWCA's executive director, a statement that cheaper apartments were available through classified ads. It also attributed to two of the shelter's residents, Gina O'Harra and Jocelyn Willis, various statements indicating a lack of security, and an abundance of crime both inside the shelter and in the surrounding neighborhood.

On Monday, July 26, 1993, Jan Schmalenberg sent letters of protest to Benson and Magnuson. On Tuesday, July 27, Benson replied by a letter that stated in part:

Thank you for your letter of July 26, 1993.

I, too, was dismayed by the article which appeared in the

Morning News Tribune on July 25, 1993, which attributed certain comments to me. Those comments were not made by me.

. . . .

I am sorry, as is the Administration of this Department, that the Pierce County Sheriff appears to have publicly taken a stand on this issue to your detriment. But, you may rest assured: THESE WERE NOT MY COMMENTS AND ARE NOT REFLECTIVE AT ALL OF WHAT I SAID.

This error in reporting was unfortunate, and the Department and I regret being affiliated with it in any way. Hopefully, it is enough for you to know that the offending comments simply were not made.[1]

Also on Monday, July 26, Jan Schmalenberg asked the Tribune to publish an advertisement describing his objections to the story. Addressing the matter of day care, he stated in part:

In regards to the day care, it is not being used because less than 15% of the tenants have a job! They never leave the complex.

The day-care was and is intended to provide a place on-site for those women . . . who work towards normalization of their lives. That includes having a vocation.

My question is whether day care should be provided for people on public assistance who don't work?[2]

Addressing the matter of security, he stated in part:

Tenants talk about security, but when threatened by those who would batter them, they do not lock themselves in the security bathrooms. We have never heard the alarms go off.

The [Tribune] says I called the gate company one hundred times, but they failed to say that with each call the gate was serviced.

---

[1]Clerk's Papers at 1889.

[2]Clerk's Papers at 16.

However, what was not said was that the tenants themselves didn't want the gate shut on weekends. They unlocked it sabotaging our security efforts.[3]

Still addressing security, Schmalenberg said that even though tenants "complain about costs, security, and lack of supervision,"[4] they were unwilling to accept the "accountability, responsibility, vocational training and personal-life counseling"[5] that the project was attempting to provide. Addressing the matter of the YWCA's support, Schmalenberg asserted that the YWCA had "never verbally or by written notice"[6] withdrawn its support. Then, he went on to say that the project's "biggest problem . . . is that without the YWCA's help, we have been unable to identify those women who are most likely to succeed."[7] He argued in some detail that the Tribune's reporting of financial arrangements and rents had been incomplete and misleading. The Tribune declined to publish the proposed ad.

On August 11, 1993, the Schmalenbergs sued the Tribune for defamation. They alleged that the Tribune had published false statements, and that "as a direct and proximate result," they had been damaged."[8] They alleged special damages in the nature of lost rent, in addition to general damages to reputation.

In September 1994, the Tribune moved for summary judgment. It supported its motion with more than 800 pages of affidavits, declarations, depositions, exhibits, and other documents. These included affidavits or declarations from six of the shelter's residents or former residents, and an excerpt from Benson's deposition. The six residents or

---

[3]Clerk's Papers at 16.

[4]Clerk's Papers at 16.

[5]Clerk's Papers at 16.

[6]Clerk's Papers at 16.

[7]Clerk's Papers at 16.

[8]Clerk's Papers at 5-6.

former residents described conditions at the shelter in about the same way as the story had, and said that the substance of the story was true. Benson said that during April, May, and June 1993, persons at the shelter had called for police assistance 31 or 32 times.

The Schmalenbergs opposed the motion with more than 950 pages of material, including affidavits or declarations from Sweet and two of the shelter's former residents, and more excerpts from Benson's deposition. In general, Benson and Sweet denied making the statements attributed to them in the article. One of the former residents said that "only 3 tenants were actually violating the rights of others"; "that the problems were being resolved,"[9] and that she "felt comfortable with the efforts being made to conquer the existing problems."[10] The other former resident said, among other things, that day care was not needed because most of the residents did not work; that she never had a problem due to Fox's being next door; and that the security gate had been broken and repaired at least a dozen times.

On October 21, 1994, the Tribune further supported the motion for summary judgment with affidavits or declarations from five sheriff's deputies. Each said that he or she had regularly patrolled the area around the shelter; that he or she had been at the shelter on numerous occasions; that conditions at the shelter were substantially the same as described in the story; and that the substance of the story was true.[11]

---

[9]Clerk's Papers at 1901.

[10]Clerk's Papers at 1902.

[11]For example, Deputy Maziarski declared:

1. I am a deputy sheriff with the Pierce County Sheriff's Department. I am familiar with the Tri-Park Residential Apartments, located at 10708 "A" Street. I worked graveyard shift from the time the project opened and through the summer of 1993.

2. I understood this was supposed to be a safe haven for battered women and their children and I do not believe it was. I regularly went to the project and investigated incidents where women were being harassed and abused by

Instead of producing evidence to contravene the deputies' testimony, the Schmalenbergs moved to strike on grounds of irrelevance, lack of personal knowledge, hearsay, and improper opinion. The trial court denied the motion.

By November 22, 1994, the trial court had before it about 2000 pages of materials, including 22 declarations

their former boyfriends or spouses. I investigated a rape, juvenile problems and narcotics problems at the project. It was one of the hot spots in my patrol area.

3. The "security gate" would regularly be broken and would remain broken for long periods of time. When it wasn't broken, it seemed that everyone had the code to the gate but the Sheriff's Department. I did not consider the security gate to be suitable security for this project. In fact, I do not believe that the gate and the fence provided any more security than would be available to an average household. I never observed any type of on-site security or personnel. I was aware that the apartments had a deadbolt lock on the bathroom doors and a telephone in the bathroom. These did not appear to provide much assistance to women who were being harassed or abused by their former spouses and boyfriends.

4. There was a lot of activity at the project. We would regularly go by and patrol the project, even if we were not called there, because we knew it was a problem area. We regularly saw people who we knew did not belong in there. There were reports of suspected drug activity. I interviewed tenants who made these complaints and investigated some of their complaints. Although we never had enough evidence to make an arrest, from the amount and type of activities that were going on there, we were suspicious that drug activity was taking place.

5. The complex is also in a bad location. It is located next to Fox's Topless Nightclub and there had been a pool hall in the area. These places attracted gang types and other clientele that would not be compatible with a complex for battered and abused women. I considered this to be a poor choice as a location for such a facility.

6. There were also regularly problems with juveniles. Many of the problems came from the outside but also, children were not supervised properly inside the complex, resulting in numerous problems.

7. I have reviewed the article that appeared in The News Tribune on July 25, 1993. I believe the article accurately describes the conditions at the project that I observed. I remember when the article came out, other deputies and I commented that it didn't tell us anything we didn't already know about the things that were taking place at the project.

8. I read in the article a quote allegedly of Pierce County Sheriff's Spokesman, Curt Benson. He was quoted as saying, "I don't know who's in charge, but they're taking women in need — victims — and doing nothing to make sure these women are protected. Whoever runs this, I think, is negligent."

9. I don't know whether or not Deputy Curt Benson made this statement but I believe the substance of the statement is accurate.

Clerk's Papers at 1925-27.

and affidavits, portions of 19 depositions, 3 videotapes, and 70 other documents. On that date, the court ruled in part, according to the Schmalenbergs' brief on appeal, "that the 'true' statements in the article were so damaging . . . that the additional untrue statements and fabricated quotations did not change the sting of the story."[12] As a result, the court granted the motion for summary judgment and dismissed the complaint with prejudice.

■ At the outset, the Schmalenbergs argue that reversal is warranted because the trial court erroneously denied their motion to strike the deputies' testimony. For the most part, however, that testimony was relevant, based on personal knowledge, and, insofar as it was lay opinion, within the purview of ER 701. Minor parts may have been inadmissible,[13] but exclusion of those parts would not have altered the meaning or impact of the remaining parts. The trial court's denial of the motion to strike was not reversible error.

■ The Schmalenbergs' main claim is that the trial court erred by ruling that their evidence was insufficient to support a claim for defamation. We review de novo, taking the evidence and reasonable inferences in the light most favorable to the plaintiffs.[14]

According to *Mark v. Seattle Times,*[15] the elements of defamation are falsity, an unprivileged communication, fault, and damages.[16] *Mark* cites only *Sims v. KIRO,*

[12]Br. of Appellant at 38.

[13]In Deputy Maziarski's declaration, for example, at least the last sentence of the fourth paragraph, the last sentence of the fifth paragraph, and the last sentence of the seventh paragraph may have been inadmissible. Even if the trial court had excluded those sentences, however, the declaration's import would have been the same.

[14]*Herron v. KING Broad. Co.,* 112 Wn.2d 762, 767-68, 776 P.2d 98 (1989).

[15]96 Wn.2d 473, 486, 635 P.2d 1081 (1981).

[16]Many later cases reiterate *Mark*'s list of elements without additional analysis. *E.g., Commodore v. University Mechanical Contractors, Inc.,* 120 Wn.2d 120, 133, 839 P.2d 314 (1992); *Herron,* 112 Wn.2d at 768; *LaMon v. Butler,* 112 Wn.2d 193, 197, 770 P.2d 1027 (1989); *Herron v. KING Broad. Co.,* 109 Wn.2d 514, 521-

*Inc.,*[17] and RESTATEMENT (SECOND) OF TORTS § 558 (1976). *Sims,* in turn, cites only RESTATEMENT (SECOND) OF TORTS § 558 (1977). RESTATEMENT (SECOND) OF TORTS § 558 provides that the elements of defamation are (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.[18] Other RESTATEMENT (SECOND) OF TORTS sections indicate that when these elements are proved, the defendant is liable "for the proved, actual harm caused to the reputation of the person defamed";[19] "for emotional distress and bodily harm that is proved to have been caused by the defamatory publication";[20] and, in some cases, "for any special harm legally caused by the defamatory publication."[21] Thus, *Mark's* list of elements omits concepts that have long been part of the law of defamation, including (a) that a statement is actionable only if

---

22, 746 P.2d 295 (1987); *Caruso v. Local 690, Int'l Bhd. of Teamsters,* 107 Wn.2d 524, 529, 730 P.2d 1299 (1987); *Guntheroth v. Rodaway,* 107 Wn.2d 170, 175, 727 P.2d 982 (1986); *Caruso v. Local 690, Int'l Bhd. of Teamsters,* 100 Wn.2d 343, 352, 670 P.2d 240 (1983); *Bender v. City of Seattle,* 99 Wn.2d 582, 599, 664 P.2d 492 (1983); *Ernst Home Ctr., Inc. v. Local 1001, United Food & Commercial Workers Int'l Union,* 77 Wn. App. 33, 43, 888 P.2d 1196 (1995); *Patterson v. Superintendent of Pub. Instruction,* 76 Wn. App. 666, 672, 887 P.2d 411 (1994); *Hitter v. Bellevue Sch. Dist. No. 405,* 66 Wn. App. 391, 400, 832 P.2d 130 (1992); *Lee v. Columbian, Inc.,* 64 Wn. App. 534, 537, 826 P.2d 217 (1991); *Haueter v. Cowles Publ'g Co.,* 61 Wn. App. 572, 581, 811 P.2d 231 (1991); *Demopolis v. Peoples Nat'l Bank,* 59 Wn. App. 105, 108-09, 796 P.2d 426 (1990); *Vern Sims Ford, Inc. v. Hagel,* 42 Wn. App. 675, 678, 713 P.2d 736 (1986). *But see Eastwood v. Cascade Broad. Co.,* 106 Wn.2d 466, 470, 722 P.2d 1295 (1986) (referring to RESTATEMENT (SECOND) OF TORTS' list of elements); *Keenan v. Allan,* 889 F. Supp. 1320 (E.D. Wash. 1995) (same).

[17]*Sims v. KIRO, Inc.,* 20 Wn. App. 229, 233, 580 P.2d 642 (1978).

[18]*See Eastwood,* 106 Wn.2d at 470; *Sims,* 20 Wn. App. at 233.

[19]RESTATEMENT (SECOND) OF TORTS § 621.

[20]RESTATEMENT (SECOND) OF TORTS § 623.

[21]RESTATEMENT (SECOND) OF TORTS § 622.

defamatory, and (b) that a causal link must exist between the element of falsity and the element of damages.[22]

■ Because *Mark's* list of elements seems incomplete, we revert to the fundamental concepts underlying today's law of defamation. In our view, those concepts generate two basic questions: (1) Did the defendant make a false statement that caused damage to the plaintiff's reputational or other compensable interest?[23] (2) If so, should the defendant be held liable for the damage? The first question addresses whether the defendant engaged in wrongful conduct, and whether that conduct caused harm to the plaintiff. Its facets include, at a minimum, (a) whether the defendant uttered the statement in issue; (b) whether the statement in issue was false in whole or in part; and (c) whether the statement's falsity, if any, was a cause of damage to the plaintiff. The second question balances the plaintiff's need for a remedy against society's need not to

---

[22]We observe in passing that *Mark's* litany of elements has generated confusion not only with respect to what the elements of defamation are, but also with respect to who must prove them. One commentator, for example, cites *Mark* for the proposition that "a defamation plaintiff has the burden of proving that a communication was not privileged." 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE, § 12.11 at 288 (1993). Yet *Mark* was based on the RESTATEMENT (SECOND) OF TORTS, which both then and now indicates that the defamation defendant who would rely on an absolute or conditional privilege has the burden of proving such privilege. RESTATEMENT (SECOND) OF TORTS § 613(2) cmt. g; *see also Caruso*, 107 Wn.2d at 538-39 (Andersen, J., dissenting). We do not address privilege in this case.

[23]We do not ask whether the defendant made a false *and defamatory* statement because, in our view, the question whether a statement is defamatory is one facet of factual causation; to ask whether a statement is defamatory is to ask whether it could cause, and did cause, harm to the plaintiff's reputational or other compensable interest. We speak in terms of reputational or other compensable interest because, according to the RESTATEMENT (SECOND) OF TORTS, a defamation plaintiff's compensable interests include not only general damage to reputation, but also emotional distress, bodily harm, and economic (i.e., "special") damages. RESTATEMENT (SECOND) OF TORTS at 197, 319, 325 (emotional distress and bodily harm); RESTATEMENT (SECOND) OF TORTS at 197, 321-22 (economic damages). *See also Time, Inc. v. Firestone*, 424 U.S. 448, 460, 96 S. Ct. 958, 47 L. Ed. 2d 154 (1976) (defamation plaintiff not prevented from obtaining compensation for "personal humiliation, and mental anguish and suffering," even in the absence of compensable damage to reputation); Earl L. Kellett, Annotation, *Proof of Injury to Reputation as Prerequisite to Recovery of Damages in Defamation Action*, 36 A.L.R.4TH 807 (1985).

deter free speech.[24] Its facets include, at a minimum, (a) whether the defendant was at fault to the degree required by law (i.e., to a degree that properly balances the plaintiff's need for a remedy against society's need to allow free speech),[25] and, (b) even if the defendant was at fault, whether his or her fault was excused or justified by the existence of an absolute or conditional privilege.[26] The first question is the one in issue here, although it is not disputed that the Tribune published the statements in question. Accordingly, we discuss falsity and factual causation, then apply our discussion to the facts of this case.

## I. Falsity

Falsity can be express or implied. It can also be total or partial. We consider each concept separately.

## A. Express v. Implied

■■ A defamation claim must be based on a statement that is provably false.[27] A statement meets this test to the extent it falsely expresses or implies provable facts,

[24]*New York Times v. Sullivan*, 376 U.S. 254, 269-70, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340-49, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 756-61, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985); *Dunlap v. Wayne*, 105 Wn.2d 529, 534, 716 P.2d 842 (1986); *Mark*, 96 Wn.2d at 482; *Taskett v. KING Broad. Co.*, 86 Wn.2d 439, 443, 546 P.2d 81 (1976) (*New York Times v. Sullivan* "clearly represents an attempt to reconcile the state's interest in protecting the reputations of its citizens and the constitutional guarantee of a free and vibrant press"); *Tilton v. Cowles Publ'g Co.*, 76 Wn.2d 707, 714, 459 P.2d 8 (1969).

[25]The law requires differing degrees of fault, depending on whether the plaintiff is a public or private figure. If the plaintiff is a public figure, he or she must prove actual malice. If the plaintiff is a private figure, he or she need only prove negligence. *LaMon*, 112 Wn.2d at 197; *Caruso*, 100 Wn.2d at 352; *Bender*, 99 Wn.2d at 599; *Taskett*, 86 Wn.2d at 445; *Camer v. Seattle-Post Intelligencer*, 45 Wn. App. 29, 41, 723 P.2d 1195 (1986); *Vern Sims Ford, Inc.*, 42 Wn. App. at 678. We do not address fault in this case.

[26]*See Taskett*, 86 Wn.2d at 458 (Horowitz, J., dissenting); RESTATEMENT (SECOND) OF TORTS §§ 585-612.

[27]*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775-76, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986); *Herron*, 112 Wn.2d at 768-69; *Camer*, 45 Wn. App. at 38.

regardless of whether the statement is, in form, a statement of fact or a statement of opinion.[28] A statement does not meet this test to the extent it does not express or imply provable facts;[29] necessarily, such a statement communicates only ideas or opinions, and "there is no such thing as a false idea."[30] The burden of proving falsity rests on the one claiming defamation.[31]

■ A statement may be provably false in at least the following ways: because it falsely represents the state of mind of the person making it, because it is falsely attributed to a person who did not make it, or because it falsely describes the act, condition or event that comprises its subject matter. Thus, if Doe says, "I think Smith said that Jones lied about the accident," the statement may be false (a) because Doe does not really think that Smith said Jones lied about the accident;[32] (b) because Smith did not say that Jones lied about the accident, even though Jones did;[33] or (c) because Jones did not lie about the way in which the accident happened.

---

[28]*Milkovich*, 497 U.S. at 19-21; *Dunlap*, 105 Wn.2d at 538-39; *Hoppe v. Hearst Corp.*, 53 Wn. App. 668, 671, 770 P.2d 203 (1989); *Benjamin v. Cowles Publ'g Co.*, 37 Wn. App. 916, 922, 684 P.2d 739 (1984); RESTATEMENT (SECOND) OF TORTS § 566 at 170.

[29]*Dunlap*, 105 Wn.2d at 537-38; *Patterson*, 76 Wn. App. at 672; RESTATEMENT (SECOND) OF TORTS § 566 at 170; *see Milkovich*, 497 U.S. 1; *Caruso*, 107 Wn.2d at 533-34.

[30]*Gertz*, 418 U.S. at 339; *Benjamin*, 37 Wn. App. at 921; *see Milkovich*, 497 U.S. at 18; *Vern Sims Ford, Inc.*, 42 Wn. App. at 683.

[31]*Philadelphia Newspapers, Inc.*, 475 U.S. at 775-76; *Herron*, 112 Wn.2d at 768-69; *Caruso*, 107 Wn.2d at 529.

[32]Thus, the United States Supreme Court has said:

[T]he statement, "I think Jones lied," may be provable as false on two levels. First, that the speaker really did not think Jones had lied but said it anyway, and second that Jones really had not lied. It is, of course, the second level of falsity which would ordinarily serve as the basis for a defamation action, though falsity at the first level may serve to establish malice where that is required for recovery.

*Milkovich*, 497 U.S. at 20 n.7.

[33]*E.g., Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 511, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991), discussed below.

■ *Masson v. New Yorker Magazine, Inc.,*[34] a case cited by both parties, involved a situation in which the defendant falsely attributed to the plaintiff a statement of opinion that falsely implied provable facts about the plaintiff. The defendant authored a book and magazine articles in which she falsely attributed to the plaintiff, a public-figure psychoanalyst, numerous opinions portraying him "as a grandiose egotist—mean-spirited, self-serving, full of braggadocio, impossibly arrogant and, in the end, a self-destructive fool."[35] According to one such opinion, for example, the plaintiff had said he was "the greatest analyst who ever lived." The plaintiff sued for defamation, and the lower courts granted summary judgment for the defendant. Reversing, the United States Supreme Court held that for constitutional purposes a falsely attributed opinion falsely implies provable facts when "the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold."[36]

## B. Total v. Partial

■ When a statement is false because it falsely describes the act, condition, or event that comprises its subject matter, it may be provably false in part but not in whole. Thus, if a television station says that a doctor has been charged with stealing $200,000, its statement may be true in that the doctor has been charged with stealing an amount in excess of $75, but false in that the doctor has not been charged with stealing $200,000. Similarly, if a television station says that a prosecutor received half his campaign contributions from bail bondsmen, its statement may be true in that the prosecutor received *some* contribu-

---

[34]501 U.S. at 522-25.

[35]*Masson,* 501 U.S. at 501 (quoting Coles' book review in the Boston Globe, Robert Coles, *Freudianism Confronts Its Malcontents in the Freud Archives,* BOSTON GLOBE, May 27, 1984 at 58, 60).

[36]*Masson,* 501 U.S. at 511.

tions from bondsmen, but false in that the prosecutor did not receive *half* his contributions from bondsmen.[37]

■ When a statement is provably false in part but not in whole, it satisfies the element of falsity (but not necessarily the other elements of defamation) regardless of whether it is false in *material* part. According to the Washington Supreme Court, materiality is better dealt with as a matter of factual causation.[38]

## II. Factual Causation

■ In the typical nondefamation negligence case, it is necessary to show factual causation. Specifically, it is necessary to prove that the plaintiff's damages would not have occurred but for the defendant's wrongful conduct.[39]

At least three Washington cases demonstrate that the same idea applies in a defamation case, regardless of the type of fault that must be proved. They are *Mark v. Seattle Times*,[40] *Herron v. KING Broadcasting Company*,[41] and

[37]These examples are based on *Mark*, 96 Wn.2d at 481, and *Herron*, 112 Wn.2d at 774.

[38]*Herron*, 112 Wn.2d at 769 n.2, 771. The *Herron* court stated that *material* falsity "is not a recognized element of defamation." *Herron*, 112 Wn.2d at 769 n.2. At the same time, however, it said the question was "whether the false statement has resulted in [i.e., caused] damage which is distinct from that caused by true negative statements also contained in the same report," or, in alternative terms, whether "the damage inflicted by [i.e., caused by] this falsehood was entirely distinct from that inflicted by [i.e. caused by] the true statements contained in the report." *Herron*, 112 Wn.2d at 771-72. It further said that a plaintiff, "as part of his showing of damage," must show that the false part of the defendant's statement affected its "sting." *Herron*, 112 Wn.2d at 769. It appears, then, that the *Herron* court was treating the materiality of a false statement as a matter of factual causation.

[39]*Taggart v. State*, 118 Wn.2d 195, 226, 822 P.2d 243 (1992); *Hartley v. State*, 103 Wn.2d 768, 778, 698 P.2d 77 (1985); *Harbeson v. Parke-Davis, Inc.*, 98 Wn.2d 460, 476, 656 P.2d 483 (1983); *Channel v. Mills*, 77 Wn. App. 268, 272, 890 P.2d 535 (1995); *Senn v. Northwest Underwriters Inc.*, 74 Wn. App. 408, 417, 875 P.2d 637 (1994); *Walker v. Transamerica Title Ins. Co.*, 65 Wn. App. 399, 403, 828 P.2d 621 (1992); *Whitchurch v. McBride*, 63 Wn. App. 272, 275, 818 P.2d 622 (1991).

[40]96 Wn.2d at 476.

[41]112 Wn.2d 762.

*Caruso v. Local 690.*[42]

In *Mark,* a pharmacist was charged with Medicaid fraud. A deputy prosecutor told the press the case was the largest of its type ever filed in the State. He also swore in an affidavit that the State had probable cause to believe the pharmacist had fraudulently billed more than $200,000. The formal criminal charge, however, alleged only that the pharmacist had defrauded the State in an amount greater than $75, and that he had submitted "voluminous amounts" of forged and false prescription forms.[43] When the charge was tried to a jury, the State proved invalid claims totaling about $2,500, and the jury convicted.

The press reported these events, but its reports were partly false. For example, KOMO-TV reported that Mark had fraudulently billed $300,000 or $350,000, and KIRO-TV reported Mark had been *charged* with defrauding the State of $200,000.

Mark sued for defamation, and the trial court granted a summary judgment of dismissal. Affirming, the Supreme Court stated:

> [T]he gist of the KIRO-TV and KOMO-TV reports was the arrest for Medicaid fraud involving large amounts of funds. No significantly greater opprobrium attaches to a statement that a person "bilked the state out of at least $300,000" (KOMO-TV's Clerk's Papers, at 451) than to one that he was charged with larceny based on an audit sample revealing "over $200,000 in fraud billing". KOMO-TV Clerk's Papers, at 420. The inaccuracy, if any, does not alter the "sting" of the publication as a whole and does not have a materially different effect on a viewer, listener, or reader than that which the literal truth would produce. *See Orr v. Argus-Press Co.,* 586 F.2d 1108, 1112-13 (6th Cir. 1978).
>
> Moreover, Mark has provided no evidence that the inaccurate statements caused him any further damage than has

[42]107 Wn.2d at 526.

[43]*Mark,* 96 Wn.2d at 477.

resulted from the conviction and sentence on a grand larceny charge. While we have considerable sympathy with Mark's wish to protect his reputation, we are of the opinion that the errors here under review did not materially add to the damage suffered by Mark by reason of the truthful publication of matters relating to the charge and conviction for grand larceny.[44]

In short, the court ruled that the press reports were partly true and partly false, and that Mark had failed to produce evidence from which a rational trier of fact could find that the false parts had caused damage that the true parts would not have caused anyway.

In *Herron,* KING-TV reported that:

a. The Pierce County Prosecutor's office was under investigation by the FBI;

b. The FBI agents were questioning the Chief Prosecutor, Don Herron, and his deputies about bail bond procedures;

c. Earlier that week, eight men were arrested and charged by the Justice Department on racketeering charges, and two of those arrested were bail bondsmen;

d. One of the arrested bondsmen, John Carbone, had contributed to Herron's election campaigns in 1974 and 1978;

e. One of the other arrested men, Lamont Zemek, was a close friend and vacation companion of Herron, and Zemek's ex-wife, Nina Zemek, was a long-time administrative aide for Herron; and

f. Bail bondsmen were irritated at the former Pierce County Prosecutor, Ron Hendry, for pushing to collect forfeited bail bond moneys.[45]

Additionally, KING-TV reported that: (g) in 1974, when Herron defeated Hendry, bail bondsmen contributed about half of Herron's campaign money; and (h) during Herron's

[44]*Mark,* 96 Wn.2d at 496.

[45]*Herron,* 112 Wn.2d at 770-71.

time in office, the prosecutor's office did not diligently forfeit bail bonds after a defendant failed to appear in court.[46] Items (a) through (f) were true,[47] but item (g) was false.[48] It is unclear whether item (h) was true or false.

When Herron sued for defamation, "KING argue[d] that these true statements are so damaging to the plaintiff that the additional untrue statement does not change the sting of the story, even though it might constitute an additional negative innuendo."[49] Agreeing, the trial court granted KING's motion for summary judgment. Reversing, the Washington Supreme Court stated:

> The question is whether the false statement has resulted in damage which is distinct from that caused by true negative statements also contained in the same report. If it has not, then whatever damage the plaintiff has suffered does not amount to defamation because it is not solely attributable to the falsehood. In that case, the plaintiff has not made a prima facie case. If, however, the plaintiff can show that the damage resulting from the falsehood is a distinct result of the falsehood, then he has established that element of his prima facie case. *Mark* requires a court to consider the defamatory report as a whole because it is necessary to determine whether or not the damage caused by the falsehood is distinct from the damage caused by the true statements in the report.[50]

Answering this question with respect to the facts at hand, the court said:

> The statement that one-half of Herron's contributions came from bail bondsmen added a distinct and separate implication that Herron had bargained away his ethics and integrity in exchange for campaign contributions. None of the true statements in the KING[-]TV report mitigated this falsehood. Furthermore, the damage inflicted by this falsehood was

[46]*Herron*, 112 Wn.2d at 765, 766 (item g); at 765 (item h).

[47]*Herron*, 112 Wn.2d at 770-71.

[48]*Herron*, 112 Wn.2d at 765-66.

[49]*Herron*, 112 Wn.2d at 771.

[50]*Herron*, 112 Wn.2d at 771-72.

entirely distinct from that inflicted by the true statements contained in the report.[51]

The court then added:

In the modern world of politics, campaign contributions are contributed by the rich and poor, the famous and infamous without inference of wrongdoing. A supporter of Prosecutor Herron who saw on KING[-]TV that he had received $825 in contributions to his campaign from bail bondsmen would say "so what" and continue to support him. There is little or no sting to such a statement.

On the other hand, if that supporter heard that the prosecutor, who in many ways affects the incomes of both bail bondsmen and Pierce County by forfeiting or not forfeiting bail bonds, was receiving 50 percent of his campaign funds from the bail bondsmen, he would assume that Herron was dishonest and in the pocket of bail bondsmen. He would never again vote for such a public official, especially a prosecutor, who has so much discretion in administering justice and setting moral standards in the county; "50 percent of all his campaign contributions" is the *sting*. There is no sting to a group of businessmen such as bail bondsmen contributing $825 to Herron's campaign. The $825 constituted only 2 percent of all of Herron's contributions, not 50 percent. The latter statement, but not the former, implied that Herron had taken a bribe.[52]

(Footnotes omitted). Ultimately, the court held the case could go to the jury because Herron had produced evidence "from which a jury could conclude that he was damaged by the falsehood in [the KING-TV] report in a way that was distinct from any damage inflicted by the true statements in the report."[53]

In *Caruso,* a union published a "do not patronize" notice which suggested that its members boycott the plaintiff's business. The notice also stated that the plaintiff had

---

[51]*Herron*, 112 Wn.2d at 772.

[52]*Herron*, 112 Wn.2d at 773-74.

[53]*Herron*, 112 Wn.2d at 774.

continuously harassed laboring people by taking their vehicle keys and impounding their equipment. The notice was not false insofar as it suggested that the union's members not patronize the plaintiff's business; without more, a mere directive such as "do not patronize" has neither truth nor falsity. The notice was false, however, insofar as it asserted that the plaintiff had continuously harassed laboring people, taken their keys and impounded their equipment. Not surprisingly, then, the Supreme Court ruled that the plaintiff could recover only for damages caused by the part of the notice that was false. According to the court, "[d]efendant is correct that damages to plaintiff's business flowing from the 'do not patronize' request are not compensable," but "[t]he jury could properly award damages . . . for defendant's conduct regarding defamation."[54]

Together, *Mark*, *Herron*, and *Caruso* teach that when a defamation defendant's statement is partly true in substance and partly false in substance, the defamation plaintiff may not recover for damage that would have occurred even without the false part. He or she may, however, recover for damage that would not have occurred but for the false part. This is the same as saying, in somewhat idiomatic terms, that a defamation plaintiff may not recover without showing that the false part of the statement increased its "sting."[55] If the false part of a statement increased its "sting," a rational trier could find that at least some of the plaintiff's damage would not have occurred but for the false part. But if the false part of a statement did not increase its "sting," a rational trier would be compelled to find that the plaintiff's damage would have occurred due to the true part, or, in equivalent but alternative terms, that the plaintiff's damage would have occurred even in the absence of the statement's false part.

This reading of *Mark*, *Herron*, and *Caruso* is confirmed

---

[54]*Caruso*, 107 Wn.2d at 532-33.

[55]*Herron*, 112 Wn.2d at 769; *Mark*, 96 Wn.2d at 496.

by a plethora of authorities holding or implying that proximate cause is an element of defamation.[56] If proxi-

---

[56]The cases seem uniform that proximate cause is an element when a defamation plaintiff seeks special damages. *Caruso*, 107 Wn.2d at 533 (plaintiff claimed special damages in the nature of certain business losses; Supreme Court stated that "instruction 10 made it clear that this action was for defamation, and that 'false statements of fact' must be a proximate cause of said damages"); *Blende v. Hearst Publications*, 200 Wash. 426, 430, 93 P.2d 733 (1939) (plaintiff may recover when language used by defendant "necessarily must, or presumably will, as its natural and proximate consequence, occasion [plaintiff] pecuniary loss . . . ."); *Simon v. Shearson Lehman Bros., Inc.*, 895 F.2d 1304, 1316 (11th Cir. 1990) ("Legal causation requires a finding that the slanderous statement was both a factual cause and a proximate cause" of plaintiff's termination from employment); *Crump v. P&C Food Mkts., Inc.*, 576 A.2d 441, 448 (Vt. 1990); RESTATEMENT (SECOND) OF TORTS §§ 622-622A. "Special damages" are compensatory damages that reflect "the loss of something having economic or pecuniary value." RESTATEMENT (SECOND) OF TORTS § 575 cmt. b, §§ 622-22A; *see also Getchell v. Auto Bar Sys. N.W., Inc.*, 73 Wn.2d 831, 835, 837, 440 P.2d 843 (1968) (special damages include loss of earnings).

The cases also seem to hold, or at least imply, that proximate cause is an element when a defamation plaintiff seeks general, or so-called presumed, damages. *Miller v. Argus Publ'g Co.*, 79 Wn.2d 816, 820 n.3, 490 P.2d 101 (1971) (trial court instructed that plaintiff had burden of establishing "that damage was proximately caused to him by the alleged libel"; according to the Supreme Court, "trial court's instructions adequately set forth the law"); *Purvis v. Bremer's, Inc.*, 54 Wn.2d 743, 752, 344 P.2d 705 (1959) (after ruling that special damages had not been pleaded, the Court said, "The test actually is whether the language used concerning a person and his affairs must from its nature, or presumably will as its natural consequence, occasion him pecuniary loss"); *Arnold v. National Union of Marine Cooks & Stewards*, 44 Wn.2d 183, 188, 265 P.2d 1051 (1954) (plaintiff "is entitled to recover those damages which the law presumes must naturally, proximately and necessarily result from publication of libelous matter"); *Roper v. Mabry*, 15 Wn. App. 819, 824 n.4, 551 P.2d 1381 (1976) ("The slandered party whose good name has been attacked is entitled to recover those damages which the law presumes must naturally, proximately and necessarily result from the publication of the slanderous matter."); *Romano v. United Buckingham Freight Lines*, 4 Wn. App. 929, 934, 484 P.2d 450 (1971); *Brown v. Petrolite Corp.*, 965 F.2d 38, 43 (5th Cir. 1992) ("A defamation plaintiff must prove that the allegedly defamatory language is false and that the defendant's publication of the language proximately caused the plaintiff's damages."); *Smith v. McDonald*, 713 F. Supp. 871 (M.D.N.C. 1988) ("The author of a defamation is liable for damages 'directly and proximately' caused."); *Luna v. Seattle Times Co.*, 186 Wash. 618, 636, 59 P.2d 753 (1936) (Beals, J., dissenting) (quoted in *Earl v. Times-Mirror Co.*, 185 Cal. 165, 172, 196 P. 57 (1921) ("plaintiff is entitled to recover for such mental worry as is proximately caused by the article"). "General damages" are compensatory damages that reflect noneconomic loss such as harm to reputation and emotional distress. RESTATEMENT (SECOND) OF TORTS § 621 cmt. a, § 623 cmt. a. Moreover, at least in Washington, so-called "presumed damages" are a form of compensatory, general damages. Presumed damages are necessarily compensatory as opposed to punitive, because "under no circumstances will [the Washington Supreme Court] allow a jury to award punitive damages." *Taskett*, 86 Wn.2d at 447; *see also Caruso*, 100 Wn.2d

mate cause is an element of defamation, factual cause is also, for proximate cause includes factual cause and legal cause.[57]

Our reading of *Mark*, *Herron*, and *Caruso* is further confirmed by traditional common-law concepts relating to defamation. According to the common law, a defamation claim may not go to the jury, for example, if the statement on which it is based (1) could not be defamatory (i.e., could not be understood by a rational trier of fact to have a meaning capable of harming reputation);[58] (2) was not

at 354; *Haueter*, 61 Wn. App. at 580; *Spokane Truck & Dray Co. v. Hoefer*, 2 Wash. 45, 51-52, 25 P. 1072 (1891); *Dempere v. Nelson*, 76 Wn. App. 403, 410, 886 P.2d 219 (1994); *but see Haueter*, 61 Wn. App. at 578 (implying that presumed damages can be recovered in the absence of "actual damages"); *Vern Sims Ford, Inc.*, 42 Wn. App. at 679-80 (same); *Corbin v. Madison*, 12 Wn. App. 318, 327, 529 P.2d 1145 (1974) (same). Presumed damages are necessarily general as opposed to special because, by definition, they are awardable in the absence of special damages. *Amsbury v. Cowles Publ'g Co.*, 76 Wn.2d 733, 737, 458 P.2d 882 (1969); *Olympia Waterworks v. Mottman*, 88 Wash. 694, 696, 153 P. 1074 (1915); *Haueter*, 61 Wn. App. at 578.

[57]*Taggart*, 118 Wn.2d at 225-26; *Hartley*, 103 Wn.2d at 777; *Channel*, 77 Wn. App. at 272; *Senn*, 74 Wn. App. at 417; *Walker v. Transamerica Title Ins. Co.*, 65 Wn. App. 399, 403, 828 P.2d 621 (1992). Legal cause, which is not in issue here, is better considered in terms of duty. *Gall v. McDonald Indus.* 84 Wn. App. 194, 207, 926 P.2d 934 (1996); *Schooley v. Pinch's Deli Mkt., Inc.*, 80 Wn. App. 862, 876, 912 P.2d 1044 (1996).

[58]*Amsbury v. Cowles Publ'g Co.*, 76 Wn.2d at 739; *LaMon v. Butler*, 44 Wn. App. 654, 658, 722 P.2d 1373 (1986); RESTATEMENT (SECOND) OF TORTS § 614(1)(a). The same idea can be alternatively expressed by asking whether "the substance of the statement makes substantial danger to reputation apparent." *See Mark*, 96 Wn.2d at 493; *Taskett*, 86 Wn.2d at 445; *Ernst*, 77 Wn. App. at 44; *Camer*, 45 Wn. App. at 38. The court determines whether a communication is capable of a defamatory meaning; if not, the case is dismissed as a matter of law, for a rational trier could not find that the statement caused damage to the plaintiff. *Caruso*, 100 Wn.2d at 354; *Amsbury*, 76 Wn.2d at 740; *Purvis*, 54 Wn.2d at 753 (quoting 3 RESTATEMENT (FIRST) OF TORTS § 614 at 304 (1938)); *Ernst*, 77 Wn. App. at 44; *LaMon*, 44 Wn. App. at 658; 16 DEWOLF & ALLEN, *supra* note 21, at 284. The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient; if not, the case is decided for the defense, for the statement cannot have caused damage. *Herron*, 109 Wn.2d at 522 ("Inaccurate reporting is not defamatory unless by altering the "sting" it creates a materially different impression on the reader"); *Funderburk v. Bechtel Power Corp.*, 103 Wn.2d 796, 800, 698 P.2d 556 (1985); *Caruso*, 100 Wn.2d at 354; *Amsbury*, 76 Wn.2d at 740; *Getchell*, 73 Wn.2d at 838; *Purvis*, 54 Wn.2d at 753 (quoting 3 RESTATEMENT (FIRST) OF TORTS § 614 at 304); *LaMon*, 44 Wn. App. at 658; 16 DEWOLF & ALLEN, *supra* note 21, at 284. The decision maker, whether judge or jury, must construe the statement "in the sense in which it would ordinarily be understood by its readers," *Amsbury*, 76 Wn.2d at 739, *Purvis*, 54 Wn.2d at 751, and in light of the context and circumstances under which

"published" (i.e., communicated) to anyone other than the plaintiff;[59] or (3) did not refer to the plaintiff (i.e., was not a statement of and concerning the plaintiff).[60] Conversely, according to the common law, a defamation claim can go to the jury, for example, if the statement on which it is based is (4) a written publication tending to expose the plaintiff to hatred, contempt, ridicule, or obloquy, or to deprive the plaintiff of the benefit of public confidence or social intercourse,[61] or (5) a statement imputing to the plaintiff a serious crime, a loathsome disease, or a matter detrimental to the plaintiff's business, trade, profession, or office.[62] In the first three examples, a rational trier of fact could *not* find that the defendant's wrongful conduct—in other words, the falsity of the defendant's statement—was a factual cause of damage to the plaintiff. In the fourth and fifth examples, a rational trier could find, based on the content of the statement and the degree of its dissemination, that the defendant's wrongful conduct—again, the falsity of the defendant's statement—was a factual cause of at least general damages to the plaintiff.

Finally, our reading of *Mark, Herron,* and *Caruso* is confirmed by Washington's law of damages. In a Washington defamation case, the plaintiff can recover compensa-

---

it was published. *Dunlap,* 105 Wn.2d at 539-40; *Getchell,* 73 Wn.2d at 837; *Purvis,* 54 Wn.2d at 752; *Ernst,* 77 Wn. App. at 45; *Hoppe,* 53 Wn. App. at 672-73; *Sims,* 20 Wn. App. at 234; 16 DeWolf & Allen, *supra* note 21, at 284-85.

[59]*Pate v. Tyee Motor Inn,* 77 Wn.2d 819, 821, 467 P.2d 301 (1970); *Haueter,* 61 Wn. App. at 578; *Corbin v. Madison,* 12 Wn. App. 318, 325, 529 P.2d 1145 (1974); Restatement (Second) of Torts § 577, § 617(a); 16 DeWolf & Allen, *supra* note 21, at 285.

[60]*Funderburk,* 103 Wn.2d at 799-800; *Camer,* 45 Wn. App. at 36-38; *Sims,* 20 Wn. App. at 233-37; Restatement (Second) of Torts § 564-564A, § 617(a); 16 DeWolf & Allen, *supra* note 15, at 286. We do not imply that the three situations set forth in the text are the only ones in which a defamation claim will not go to the jury. Obviously, there may be others as well.

[61]*Caruso,* 100 Wn.2d at 353; *Amsbury,* 76 Wn.2d at 737, 739; *Purvis,* 54 Wn.2d at 751; *Vern Sims Ford, Inc.,* 42 Wn. App. at 678; *Corbin,* 12 Wn. App. at 325.

[62]*Grein v. LaPoma,* 54 Wn.2d 844, 846, 340 P.2d 766 (1959); W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 111, at 775 (5th ed. 1984); Restatement (Second) of Torts §§ 570-74, § 615; *see Getchell,* 73 Wn.2d at 837. We do not imply that the two situations set forth in the text are the only ones in which a defamation claim will go to the jury. Obviously, there are others as well.

tory damages, but "under no circumstances will [the Washington Supreme Court] allow a jury to award punitive damages."[63] The goal of compensatory damages is to compensate the plaintiff for harm caused by the defendant's wrongful conduct.[64] In Washington, then, a defamation plaintiff can recover damages only if he or she proves harm factually caused by the defendant's wrongful conduct.[65]

## III. Application to this case

The Schmalenbergs contend the Tribune's story was false in two ways. First, they claim it was substantively false (in other words, that it falsely described conditions at the shelter, the rent being charged, and the withdrawal of support by the YWCA). Second, they claim that it falsely attributed to Benson and Sweet statements that Benson and Sweet had not made. For both reasons, they say, they are entitled to try their claim for defamation.

Given the discussion above, these arguments raise two questions. (1) Taking the evidence in the light most favorable to the Schmalenbergs, could a rational trier of fact find that the substantively false parts of the Tribune's story were a factual cause of damage that would not have been caused anyway by the substantively true parts of the

---

[63]*Taskett*, 86 Wn.2d at 447; *see also Caruso*, 100 Wn.2d at 354; *Haueter*, 61 Wn. App. at 580; *Spokane Truck & Dray Co. v. Hoefer*, 2 Wash. 45, 51-52, 25 P. 1072 (1891); *Dempere v. Nelson*, 76 Wn. App. 403, 410, 886 P.2d 219 (1994); *but see Haueter*, 61 Wn. App. at 578 (implying that presumed damages can be recovered in the absence of "actual damages"); *Vern Sims Ford, Inc.*, 42 Wn. App. at 679-80 (same); *Corbin*, 12 Wn. App. at 327 (same).

[64]*Pugel v. Monheimer*, 83 Wn. App. 688, 692, 922 P.2d 1377 (1996); *Pepper v. J.J. Welcome Constr. Co.*, 73 Wn. App. 523, 543, 871 P.2d 601 (1994).

[65]For an arguably nonsensical statement, *see Kanaga v. Gannett Co.*, 687 A.2d 173, 183 (Del. 1996) ("proof of damage proximately caused by publication deemed to be libelous need not be shown in order for a defamed plaintiff to recover . . . compensatory damages"). How, we inquire, can a plaintiff be entitled to recover *compensatory* damages from a defendant if the plaintiff does not show that his or her damages were *caused* by the defendant? *See Camer*, 45 Wn. App. at 44.

story?[66] (2) Taking the evidence in the light most favorable to the Schmalenbergs, could a rational trier of fact find that the false attributions in the Tribune's story were a factual cause of damage that would not have been caused anyway by the substantively true parts of the story?[67]

In our view, the answer to the first question is no. The gist of the Tribune's story was that sordid conditions existed at the project in July 1993; that the YWCA had withdrawn its support; and that the project was charging rent too high for low-income battered women to afford. Based on the evidence presented, including but not limited to the testimony of the five deputies and personnel from the YWCA, no reasonable person could find that these assertions were false. A reasonable person could find that the story was false in minor respects,[68] but no reasonable person could find that falsity of this minor sort was a factual cause of damage that would not have occurred anyway, due to the gist of the story being true.

In our view, the answer to the second question is also no. Unlike the attributions in *Masson*, the attributions here did not impute fictitious attitudes or beliefs to the Schmalenbergs.[69] Rather, the attributions here only made it more likely that the story's readers would take as true various facts that were indeed true. Given this record, a rational trier could not find that the story's false attributions caused damage to the Schmalenbergs that would not

[66]This question can be phrased in at least two alternative ways. (1) Could a rational trier of fact find that the substantively false parts of the Tribune's story were a factual cause of damage that would not have occurred but for those false parts? (2) Could a rational trier find that the false parts of the story increased its "sting"?

[67]Like the first question, this one can be phrased in at least two alternative ways. *See* preceding note.

[68]The Schmalenbergs point out, for example, that the story quoted resident Gina O'Harra as saying her husband beat her after he broke into her apartment. In fact, according to O'Harra's later testimony, her husband beat her after she let him into her apartment.

[69]We are not concerned with, and do not consider, whether the false attributions might have caused damage to Benson or Sweet. Neither of them is a plaintiff here.

604

have been caused anyway by the story's true substance, and thus we agree with the trial court that the evidence is insufficient to support an action for defamation.

Affirmed.

BRIDGEWATER, A.C.J., and ARMSTRONG, J., concur.

Review denied at 134 Wn.2d 1013 (1998).