# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

DRAKE H. SISLEY and ANTOINETTE )
L. SISLEY, husband and wife, )          No. 69316-6-I
                              )
            Appellants,       )          ORDER GRANTING MOTIONS
                              )          TO PUBLISH
        v.                    )
                              )
SEATTLE PUBLIC SCHOOLS, a local )
government entity,            )
                              )
            Respondent.       )

The appellants, Drake and Antoinette Sisley, and respondent, Seattle Public Schools, have filed motions to publish herein. The court has taken the matters under consideration and has determined that the motions should be granted.

Now, therefore, it is hereby

ORDERED that the motions to publish the opinion filed in the above-entitled matter on February 24, 2014, are granted. The opinion shall be published and printed in the Washington Appellate Reports.

Done this 19th day of March, 2014.

FOR THE PANEL:

_____
                Judge

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DRAKE H. SISLEY and ANTOINETTE ) 
L. SISLEY, husband and wife, )    No. 69316-6-I
                                    )
           Appellants, )    DIVISION ONE
                                    )
           v. )    PUBLISHED OPINION
                                    )
SEATTLE PUBLIC SCHOOLS, a local )
government entity, )
                                    )
           Respondent. )    FILED: February 24, 2014

GROSSE, J. — To overcome a defendant's motion for summary judgment dismissal in an action for defamation, a plaintiff must establish falsity, unprivileged communication, fault, and damages. Here, the plaintiff failed to do so and thus the summary judgment dismissal of the defamation claim was appropriate. We affirm the trial court's order.

## FACTS

In March 2009, *The Roosevelt News,* Roosevelt High School's student newspaper, published an article entitled, "Sisley Slums Cause Controversy: Developers and neighborhood clash over land use." The article, written by Emily Shugerman, a student at Roosevelt High School, discussed the controversy regarding development plans on properties surrounding the high school— properties owned by brothers Drake and Hugh Sisley (the Sisley brothers). Shugerman's article stated:

> A fixture on the landscape of Roosevelt, the "<u>Sisley Slums</u>" are the <u>run-down houses</u> located on the block west of 15th and 65th. Also endearingly referred to as the "<u>crack shacks</u>" or <u>ghetto houses</u>", these buildings are rental houses owned by the <u>infamous landlords</u>

Drake and Hugh Sisley. The Sisleys own more than forty pieces of property in Northeast Seattle, and have <u>a bad reputation amongst both locals and city officials</u>. In fifteen years these brothers have acquired 48 housing and building maintenance code violations, and have also <u>been accused of racist renting policies</u>. In his defense, Drake Sisley says that bad renters are to blame for the accumulating violations. No matter what the reason, the houses have become a well-known eye sore - but the neighborhood may not have to deal with them for much longer.[1]

Following the publication of the article, Drake and Antoinette Sisley (collectively Sisley) filed an action against the Seattle Public Schools (district) for defamation and libel. The district moved for summary judgment pursuant to CR 56. The district asserted that Sisley's vicarious liability theory failed as a matter of law because a public school student is not an agent or employee of the school district for whom the district may be vicariously liable for the intentional tort of defamation. The district additionally contended that dismissal of Sisley's claim was appropriate because he was unable to prove the elements of defamation.[2]

In support of its motion for summary judgment, the district cited several articles printed in various Seattle newspapers. Each of the articles concerned the deplorable conditions of the Sisley brothers' rental properties, referring to the brothers as among Seattle's worst "slumlords" and reporting on the numerous housing code violations on their properties. Many of the articles also describe

---

[1] Underlined portions of the article are the specific statements Sisley asserts are defamatory.

[2] This is one of several grounds on which the trial court granted the district's motion for summary judgment dismissal of the Sisley claim. We need not address the other reasons given for dismissal in order to resolve this case and, therefore, do not do so.

the Sisley brothers' relationship with Keith Gilbert, the founder of a white supremacist organization, who had been convicted of multiple racist hate crimes.

The trial court granted summary judgment dismissal. Sisley appeals.

ANALYSIS

Sisley contends that the article in the newspaper was false, defamatory, slanderous, and maliciously published. Sisley denies owning, managing, or having anything to do with the properties described in the article.

In its review of a summary judgment order, this court engages in the same inquiry as the trial court.[3] "When a defendant in a defamation action moves for summary judgment, the plaintiff has the burden of establishing a prima facie case on all four elements of defamation: falsity, an unprivileged communication, fault, and damages."[4] Not "every misstatement of fact, however insignificant, is actionable as defamation."[5] Rather, "state law requires not only that there be fault on the part of the defamation defendant, but that the substance of the statement makes substantial danger to reputation apparent."[6] "The defamatory character of the language must be apparent from the words themselves."[7] Where language is ambiguous, "resolution in favor of a 'disparaging connotation' is not justified."[8] A defamation claim may not be based on the negative

---

[3] Camer v. Seattle Post-Intelligencer, 45 Wn. App. 29, 35, 723 P.2d 1195 (1986).
[4] LaMon v. Butler, 112 Wn.2d 193, 197, 770 P.2d 1027 (1989).
[5] Mark v. Seattle Times, 96 Wn.2d 473, 493, 635 P.2d 1081(1981).
[6] Mark, 96 Wn.2d at 493 (emphasis, internal quotation marks, and citations omitted).
[7] Lee v. Columbian, Inc., 64 Wn. App. 534, 538, 826 P.2d 217 (1991).
[8] Lee, 64 Wn. App. at 538 (quoting Exner v. American Med. Ass'n, 12 Wn. App. 215, 219, 529 P.2d 863 (1974)).

implication of true statements.[9] This is because "[d]efamatory meaning may not be imputed to true statements."[10]

The element primarily at issue in this case is falsity. "Falsity in a classic defamation case is a false statement."[11] In a defamation by implication case, the plaintiff must show that the statement at issue is provably false, either because it is a false statement or because it leaves a false impression.[12]

> With respect to falsity, Washington does not require a defamation defendant to prove the literal truth of every claimed defamatory statement. . . . A defendant need only show that the statement is substantially true or that the gist of the story, the portion that carries the "sting," is true. . . . The "sting" of a report is defined as the gist or substance of a report when considered as a whole. . . . In applying this test, [the court] require[s] plaintiffs to show that the false statements caused harm distinct from the harm caused by the true portions of a communication[.][13]

"Where a report contains a mixture of true and false statements, a false statement (or statements) affects the 'sting' of a report only when 'significantly greater opprobrium' results from the report containing the falsehood than would result from the report without the falsehood."[14] The mere omission of facts favorable to the plaintiff or facts the plaintiff thinks should have been included in a publication does not make that publication false.[15] As recently noted by this court in Sisley v. Seattle School District No. 1, "the question is not whether the

---

[9] Yeakey v. Hearst Commc'ns, Inc., 156 Wn. App. 787, 792, 234 P.3d 332 (2010).
[10] Yeakey, 156 Wn. App. at 792.
[11] Mohr v. Grant, 153 Wn.2d 812, 823, 108 P.3d 768 (2005).
[12] Mohr, 153 Wn.2d at 825.
[13] Mohr, 153 Wn.2d at 825 (internal quotation marks and citations omitted).
[14] Herron v. KING Broad. Co., 112 Wn.2d 762, 769, 776 P.2d 98 (1989) (quoting Mark, 96 Wn.2d at 496).
[15] Mohr, 153 Wn.2d at 827.

statement is literally true but, rather, whether 'the statement is substantially true' or 'the gist of the story, the portion that carries the "sting," is true.'"[16] Here, as there, the evidence presented to the trial court demonstrated that Drake Sisley had knowingly allowed Gilbert, who had been criminally convicted of racist hate crimes, to manage at least one of the properties in the Roosevelt neighborhood. Drake attempts to deny that Gilbert managed his properties stating that Gilbert was only a tenant and that the property was in the University District, not the Roosevelt District. But the gist of the article was about the Roosevelt neighborhood and Northeast Seattle. The article did not limit itself to just the Roosevelt District. Drake was also aware that Gilbert had been reported to have mistreated tenants in the rental properties. He testified that he was aware of the newspaper articles and that Gilbert was a white supremacist racist who used strong-arm tactics with tenants. Numerous Seattle newspaper reports describing Gilbert as a "racist" or "bigot" linked Gilbert to the Sisley brothers, commenting on, for example, the "strong-arm tactics" used by Gilbert against tenants of the rental properties owned by the Sisleys. Moreover, in addition to reading such newspaper articles, Shugerman attended a neighborhood association meeting where she discussed the rental properties and their development with community members.[17] Given this information, the Sisleys cannot demonstrate the falsity of

---

[16] 171 Wn. App. 227, 234, 286 P.3d 974 (2012); rev. den., 176 Wn.2d 1015, 297 P.3d 706 (2013) (quoting Mark, 96 Wn.2d at 494).

[17] Although Shugerman does not now recall where she learned that the Sisley brothers had been "accused of racist renting policies," it is the Sisleys' burden to show that the statement is false, not Shugerman's burden to demonstrate its truth. Schmalenberg v. Tacoma News, Inc., 87 Wn. App. 579, 591, 943 P.2d 350 (1997)).

the statement that Hugh and Drake Sisley had been "accused of racist renting policies."

In Sisley, this court focused on the same student article and found that as to Hugh Sisley, the statement that the brothers had been "accused of racist renting policies" was not defamatory.[18] The court noted that the "'sting' of the allegedly defamatory statement is that the Sisley brothers had been accused of being racist landlords—not that they are racist landlords or that they had enacted formal rental policies that discriminated on the basis of race."[19] Likewise, the "sting" of the statement here is that Drake Sisley had also been accused of being a racist landlord. Other than a bare allegation of falsity, Sisley, like his brother Hugh, failed to establish a genuine issue of material fact. In sum, the evidence here demonstrated that Sisley had knowingly allowed Gilbert, who had been criminally convicted of racist hate crimes, to manage his property in Northeast Seattle. Sisley was aware that Gilbert had been reported to have mistreated tenants in the rental properties and numerous Seattle newspaper reports described Gilbert's association with the Aryan Nations. Given this information, Sisley cannot demonstrate the falsity of the statement. Under Schmalenberg, it is Sisley's burden to show the reports are false.[20]

Sisley argues that the property he owns is in the University or Lake City Districts not the Roosevelt District, even though at least four of his rental properties are within approximately one mile of the high school. As noted

---

[18] 171 Wn. App. at 233.

[19] Sisley, 171 Wn. App. at 235 (emphasis omitted) (citing Herron, 112 Wn.2d at 769).

[20] 87 Wn. App. at 591.

previously, this argument fails because the article is not limited to just the Roosevelt District. Sisley also argues that his properties are not run down. He admits that he has received over 40 notices of violations, but asserts that he corrected those violations promptly. However, one of those properties involved a lawsuit with two tenants who successfully sued him over the rat infestation in their rental property.[21]

Sisley's primary complaint regards the article's reference to the properties as "crack shacks." Sisley argues that it is libelous per se because it accuses him of criminal behavior thus holding him up to ridicule. A publication is libelous per se if it "tends to expose a living person to hatred, contempt, ridicule or obloquy, or to deprive him of the benefit of public confidence or social intercourse, or to injure him in his business or occupation."[22] A defamatory statement is libelous per se if it imputes that the plaintiff's conduct is criminal and involves moral turpitude.[23] But the article does not say that Sisley runs crack shacks. Rather, it states that the houses are "endearingly referred to" as "crack shacks" or "ghetto houses." Anyone reading that article would interpret the quoted appellations as nothing more than a term that some people use to refer to the condition of those houses and not that the owners deal cocaine from the houses. The statement itself does not impute criminal activity to Sisley. There is nothing in the record to suggest that the author made up these comments or misreported what the

---

[21] At the deposition, Sisley noted that it was he who sued the tenants. After he received the tenants' demands, Sisley went in and obtained a restraining order against the tenants, which was issued ex parte and later quashed.
[22] Purvis v. Bremer's, Inc., 54 Wn.2d 743, 751, 344 P.2d 705 (1959).
[23] Maison de France v. Mais Oui!, Inc., 126 Wn. App. 34, 45, 108 P.3d 787 (2005) (citing Ward v. Painters' Local 300, 41 Wn.2d 859, 252 P.2d 253 (1953)).

speakers said or that the speakers were lying. The statements cannot be the basis of a defamation claim because there is no evidence that they are false. Additionally, it is not defamatory because it is an opinion or not a false statement. The appellation can be taken as either an opinion or a generalization of the type of housing. The use of the term "endearingly referred to" as a preface to the appellation "crack shacks" makes the gist of the story about the condition of the houses, not that criminal activity is taking place.

Affirmed.

WE CONCUR: