# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| COURTNEY ALLEN and STEVE ALLEN, a married couple,<br><br>Respondents,<br><br>v.<br><br>TODD ZONIS, and the marital community of TODD ZONIS and JENNIFER ZONIS,<br><br>Appellants. | No. 76768-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: December 24, 2018 |

APPELWICK, C.J. — Zonis appeals a jury verdict in favor of Allen on claims of electronic impersonation, invasion of privacy, intentional infliction of emotional distress, and defamation. Zonis asserts that the trial court erred in dismissing most of his counterclaims on summary judgment, and that Allen improperly appealed to the jury's emotions. He also challenges the exclusion and admission of certain evidence. And, he contends that the trial court abused its discretion in instructing the jury, not ordering Allen to produce phone records until three weeks before trial, and including Jennifer Zonis's name on the judgment. Finally, he asserts that uneven time allotment at trial violated his right to due process, and that cumulative error denied him a fair trial. We affirm.

## FACTS

Courtney and Steve Allen have been married since 2001 and live in Kent, Washington. In 2012, Courtney met Todd Zonis, an Arizona resident, through an

online game. They began chatting online and became friends. The friendly communication eventually turned into a sexual relationship. They sent each other explicit text messages, e-mails, and videos in which they were naked Todd also sent Courtney[1] a sex toy.

Steve discovered his wife's e-mails with Todd and was "shocked" and "devastated." Steve began following a relationship advice program called Marriage Builders. Marriage Builders has a website with an online forum, where people with accounts can post and ask advice for dealing with an affair. The program suggested ending the secrecy of the affair by making it public. Following this advice, Steve told his family and friends about the affair to solicit support. He also contacted Todd's parents, to elicit help in encouraging him to end the affair. And, he sent a Facebook message to Todd's wife, Jennifer. Initially, Courtney did not end her contact with Todd. But, Courtney then realized that Todd was editing texts and e-mails allegedly from her husband in an attempt to manipulate her, and resolved to end contact with Todd.

After Courtney told Todd that she no longer wanted contact, Todd sent explicit images of her to her friends, family, and coworkers, and distributed them to the public. Todd sent threatening e-mails to Steve and Steve's coworkers. Courtney's mother began receiving constant calls, Facebook messages, and e-mails from people she did not know. Courtney and Steve received threatening voice mails. Fake social media accounts were created under assumed names,

---

[1] We use first names to separate the actions of an individual from the representation of the marital community, which we later refer to jointly.

sometimes those of Steve or Courtney or their relatives. The accounts were used to post explicit photos of Courtney and to message Courtney and Steve's contacts. A letter was sent to approximately 70 of Courtney and Steve's neighbors stating that Courtney engaged in "chronic masturbation." The letter continued, "This is happening in your community, people. Your children may play together. Your wife may shop with Courtney. You may see this disgusting Steven as you drive by. Let him know what you think right here." This is not an exhaustive list of all the harassment Courtney and Steve received.

Steve got a protection order against Todd  Later, Courtney also got a protection order against Todd. Todd sent her an e-mail two days later, violating the order.

Allen filed suit in Washington against Zonis for electronic impersonation, invasion of privacy, outrage or intentional infliction of emotional distress, negligence, and defamation.[2] Zonis then sued Allen in federal court in Arizona for (1) violating Arizona Revised Statute § 13-3004, (2) defamation, (3) false light invasion of privacy, (4) public disclosure of private facts, (5) intrusion upon seclusion, and (6) intentional infliction of emotional distress. The federal court dismissed Zonis's claims, because they had to be brought as compulsory counterclaims in Washington  Allen moved for summary judgment in the Washington case, which the court granted in part, dismissing most of Zonis's counterclaims. Following a trial, the jury found Todd liable for electronic

_____

[2] We use "Allen" to refer to the marital community of Steve and Courtney and "Zonis" to refer to the marital community of Todd and Jennifer.

3

impersonation, invasion of privacy, intentional infliction of emotional distress, and defamation. It awarded Allen $8 9 million in damages Allen was found not liable on Zonis's remaining counterclaims, except for intrusion upon seclusion, for which the jury did not award damages. Zonis appeals.

## DISCUSSION

Zonis makes ten arguments. First, he argues that the trial court erred when it dismissed three of his claims on summary judgment. Second, he argues that Allen intentionally inflamed, prejudiced, and misled the jury. Third, he argues that the trial court erred when it allowed Allen to raise the issue of Zonis's insurance, and that the curative jury instruction did not cure the prejudice. Fourth, he argues that the trial court abused its discretion in admitting and excluding evidence. Fifth, he argues that the trial court abused its discretion when it permitted Allen to cross-examine him with an exhibit that had not been admitted, and then admitted the exhibit posttrial. Sixth, he argues that the trial court abused its discretion when it gave the jury misleading instructions. Seventh, he argues that the trial court erred when it did not order Allen to produce phone records until three weeks before trial. Eighth, he argues that the uneven time allotment at trial violated his right to due process. Ninth, he argues that cumulative error denied him the right to a fair trial. Tenth, he argues that the trial court erred in naming Jennifer Zonis as a party on the final judgment.

I. Claims Dismissed on Summary Judgment

Zonis argues first that the trial court erred in dismissing three of his claims on summary judgment. He argues that the trial court erred in dismissing his (1) defamation claim, (2) false light claim, and (3) wiretapping claims under both Arizona and Washington law.

A. Standard of Review

This court reviews summary judgment orders de novo and performs the same inquiry as the trial court, viewing all facts and reasonable inferences in the light most favorable to the nonmoving party. Elcon Const., Inc v E. Wash Univ., 174 Wn.2d 157, 164, 273 P.3d 965 (2012). Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Id.

B. Defamation

Zonis challenges the court's dismissal of his defamation claims as to two communications: (1) an e-mail from Steve to Todd's parents revealing the internet affair, and (2) Steve's posts to the Marriage Builders online forum describing what he believed was Todd's police record.

To survive a defense motion for summary judgment, a defamation plaintiff must allege facts that would raise a genuine issue of fact for the jury as to each element. Mohr v Grant, 153 Wn.2d 812, 822, 108 P.3d 768 (2005). The elements a plaintiff must establish in a defamation case are falsity, an unprivileged communication, fault, and damages. Id. A defamation claim may not be based on

5

the negative implication of true statements. Sisley v. Seattle Pub. Sch., 180 Wn. App. 83, 87, 321 P.3d 276 (2014) (Sisley II). This is because defamatory meaning may not be imputed to true statements. Id.

Falsity in a classic defamation case is a false statement. Id. Washington does not require a defamation defendant to prove the literal truth of every claimed defamatory statement. Mohr, 153 Wn.2d at 825. "'A defendant need only show that the statement is substantially true or that the gist of the story, the portion that carries the "sting", is true.'" Id. (quoting Mark v. Seattle Times, 96 Wn.2d 473, 494, 635 P.2d 1081 (1981)). The "sting" of a report is defined as the gist or substance of a report when considered as a whole. Id.

1. E-mail

The e-mail Steve sent Todd's parents stated,

If you have a son, Todd Zonis, I wish to inform you that he is having an Internet affair with my wife, Courtney Allen. This involves, texts, emails [sic], cell calls, internet video calls and shared recorded videos of masturbation. You're [sic] son made a cast of his penis as a sex toy and sent it to my wife.

This is ruining my marriage and risking our family (my wife, me, and our son). I have heard that your son and his wife, Jennifer have and [sic] open relationship, but those usually strongly discourage emotional attachment. This affair, initially started August 2013, initial discovery Sept 25, 2013 and restarted in March 2014 (I think, could have been earlier) and ongoing [sic] to today. You obviously have children and valued your marriage. I would ask that you encourage your son to stop this affair before if completely ruins our family.

If you have any questions or would like to see some of the evidence, please email [sic] me.

Thanks [sic] You, Sincerely,

Steven Allen

6

In dismissing Zonis's defamation claim on summary judgment, in regards to the above e-mail, the trial court stated,

> The Zonises take issue with the use of the term "affair" because there was no actual physical contact involved, assert that the sex toy was not a cast of Mr. Zonis's penis, and assert that they are not "swingers" so that Mr. Allen's assertion regarding their having an open relationship is false. Because it is disputed whether the sex toy sent by Mr. Zonis to Ms. Allen was a cast of his own penis or an off-the-shelf item, the court assumes for purposes of this motion that it was an off-the-shelf item. However, because it is undisputed that the Zonises sent Ms Allen a penis-shaped sex toy, the e-mail has the gist of truth and is substantially true. . . . The Zonises claim that other aspects of the e-mail are false, including Mr. Allen's claim that Mr. Zonis engaged in an "online affair" with his wife and his claim that Ms. Allen had told him that the Zonises had an open relationship. Those arguments are unpersuasive. While the term "internet affair" or "online affair" may not be specifically defined in the law, its meaning is widely understood; Mr. Allen's representation of what occurred between his wife and Mr. Zonis as an internet or online affair is substantially true and/or is an expression of Mr. Allen's opinion about the nature of the relationship. There is no evidence Mr. Allen's statement regarding what his wife told him regarding the openness of the Zonises' relationship is false. Thus, the defamation claims fails [sic] because the Zonises have failed to meet their burden of production to show falsity.

(Emphasis added )

In his declaration, Zonis acknowledged that he sent a sex toy to Courtney. Zonis also acknowledged receiving "videos or pictures" from Courtney. In her declaration, Courtney stated that she had an internet affair with Todd that "included text messages, phone calls, video calls, and sharing sexually explicit videos of one another." In response, Zonis did not provide evidence to disprove that Todd and Courtney had an online relationship, but argued that the relationship was not an "affair" because there was no sexual intercourse. Even drawing all reasonable

inferences from the evidence in favor of Zonis, the record does not include evidence constituting a prima facie case of falsity of the "sting" of the allegedly defamatory e-mail   Given the undisputed fact that Zonis sent Courtney a sex toy, and the nature of the online contact between Todd and Courtney, a jury could not have found the gist of the e-mail false.  Having failed to establish falsity, summary judgment was properly granted.

## 2. Marriage Builders Posts

Zonis also argues that the trial court erred in dismissing his defamation claim as to Steve's internet posts in which he discussed Zonis's criminal history. Zonis points to two of Steve's posts.  In the first, Steve wrote,

> I don't doubt he might try something physical given his police record which my grandma said was quite long (the police ran his name and number as part of their investigation and passed on this information to her).  I know he's been arrested for numerous bar fights among other things

In the second post, Steve wrote, "[B]ecause of his background and it not being a first time offense, would definitely not be in the minimum sentence area and would be looking at multiple years in prison."

In dismissing the claim on summary judgment, the trial court stated,

> As to the Marriage Builders . . . postings, the Zonises have not demonstrated the falsity of any of the postings; the majority of the postings constitute opinions, advice to Mr. Allen, or questions from Mr. Allen rather than factual assertions. . . .
>
> . . . In addition, the Zonises have not created a genuine issue of material fact supporting their claim of damages from the posts.  They have not identified in either their declarations or any of their exhibits any individuals they know or knew who viewed the Marriage Builders . . . postings, nor have they identified any damages that resulted from such viewings.  For the first time during oral argument Mr. Zonis

8

asserted that friends had seen the postings because he had told friends about them and directed them to where to review them; however, that it is not part of the record before the court.

Zonis argues that the "untrue statement" about his criminal history supports a claim of defamation per se. He cites Davis v Fred's Appliance, Inc., 171 Wn. App. 348, 367, 287 P.3d 51 (2012), in which this court stated that "defamation per se generally requires imputation of a crime or communicable disease." A communication is defamatory per se if it is false content that exposed the plaintiff to hatred, contempt, ridicule, deprived him of public confidence, or injured him in business, trade, profession or office. Life Designs Ranch, Inc. v. Sommer, 191 Wn. App. 320, 328, 364 P.3d 129 (2015), review denied, 185 Wn.2d 1002, 369 P.3d 500 (2016).

Zonis asserts that Allen never presented evidence that Todd has ever committed a crime. But, the burden is on Zonis as the plaintiff on this claim to show that the statement at issue is provably false, either because it is a false statement, or because it leaves a false impression. Sisley II, 180 Wn. App. at 87-88. The only evidence that Zonis provided to the trial court to prove the falsity of the statements was a letter from the Arizona department of public safety, that stated it could not release the requested criminal history. The fact that Arizona rejected a criminal history request does not prove that Zonis does not have a criminal history in any state. And, as the trial court correctly found, Zonis did not identify any individuals he knew who viewed the postings, nor did he identify any damages that resulted from such viewings. Thus, he has not shown that Allen made false statements that caused harm.

9

The trial court did not err in dismissing Zonis's defamation claim on summary judgment.

C. False Light

Zonis also challenges the court's dismissal of his false light claim. He argues that Allen's e-mail and online posts placed him in a false light, and that the court applied an incorrect standard in dismissing his claim.

In dismissing Zonis's false light claim, the trial court explained that the claim "fails because, as explained above in the discussion of [the counterclaim for defamation], the Zonises cannot demonstrate the falsity of Mr. Allen's statements or that they presented Mr. Zonis in a false light."

A false light claim arises when someone publicizes a matter that places another in a false light if (a) the false light would be highly offensive to a reasonable person and (b) the actor knew of or recklessly disregarded the falsity of the publication and the false light in which the other would be placed. Eastwood v. Cascade Broad. Co., 106 Wn.2d 466, 470-71, 722 P.2d 1295 (1986) In discussing the difference between a defamation action and a false light action, our Supreme Court has stated, "A plaintiff need not be defamed to bring a false light action: 'It is enough that he is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position.'" Id. at 471 (quoting RESTATEMENT (SECOND) OF TORTS § 652E, comment b (1977)). "So, like defamation, false light claims

10

require a showing of falsity and knowledge of, or reckless disregard for, that falsity." Corey v. Pierce County, 154 Wn. App. 752, 762, 225 P.3d 367 (2010).

As with the defamation claim, Zonis failed to show that these communications were false. Zonis cites to three e-mails allegedly from Steve as evidence for his theory that "Ms. Allen imagined this affair with Mr. Zonis." But, the e-mails do not support that theory. Given Todd's declaration and the nature of the online contact between Todd and Courtney, a jury could not find the gist of Steve's e-mail to Todd's parents to be false. Nor did Zonis provide evidence to prove the falsity of Steve's online posts. Because Zonis did not establish that the communications were false or that Steve knowingly or recklessly disregarded the falsity, we do not reach the second element, that the communications caused Zonis emotional distress. See Eastwood, 106 Wn.2d at 471 (False light differs from defamation in that it focuses on compensation for mental suffering, rather than reputation.). The trial court properly dismissed Zonis's false light claim.

D. Wiretapping

Zonis asserts next that the trial court erred in (1) not conducting a choice of law analysis and dismissing his wiretapping claim under Arizona law, and (2) dismissing his wiretapping claim under Washington law.

1. Choice of Law

Allen argues that Zonis is judicially estopped from arguing on appeal that Arizona law applies to his wiretapping claim. In his motion opposing summary judgment, Zonis cited Arizona's statute prohibiting illegal wiretapping. But, at the

11

summary judgment hearing, Zonis told the trial court that he had mistakenly left the Arizona statute in his pleading, explaining that he had originally pleaded the same claims in the Arizona district court.

Zonis argued at the hearing,

> As for -- as for the violation of wiretap statute First of all, the wiretap statute does allow for compensation of people that were wronged by -- because of Mr. Allen's actions. We can be compensated by that directly, even though it's a criminal statute.
>
> . . . .
>
> The violation of the Stored Communications Act[3] is a second part of that. . . . I'm reading the RCW right now. Yeah, so we weren't asking for Arizona law to be implemented. We were simply stating that when this was originally pleaded and properly pleaded in the Arizona District Court we changed almost nothing from it. I just had to cross reference the numbers and errors might have been.
>
> . . . .
>
> Okay. My wife just informed me that the RCW allows for $100 per day under --
>
> MS. ZONIS: Per each day of violation.
>
> MR. ZONIS: Yeah. Anyway. So that's -- that's that one.

(Emphasis added.)

Judicial estoppel is an equitable doctrine that precludes a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position. Arkison v. Ethan Allen, Inc., 160 Wn.2d 535, 538, 160 P.3d 13 (2007). In deciding whether to apply the judicial estoppel doctrine, the court looks to (1) whether a party's later position is clearly inconsistent

---

[3] Zonis was most likely referring to Washington's privacy act, chapter 9.73 RCW.

12

with its earlier position, (2) whether judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled, and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. Id. at 538-39.

On appeal, Zonis cannot fault the trial court for not conducting a choice of law analysis after he told the court that he was not asking for it to apply Arizona law. Judicial estoppel prevents Zonis from taking an inconsistent position and now arguing that Arizona law should apply to his wiretapping claim.

2. Washington Privacy Act

Alternatively, Zonis asserts that the trial court erred in dismissing his claim under this state's privacy act, codified under chapter 9.73 RCW.

Washington's privacy act, which prohibits anyone not operating under a court order from intercepting or recording certain private communications without the consent of all parties, is one of the most restrictive surveillance laws ever promulgated. State v. Roden, 179 Wn.2d 893, 898, 321 P.3d 1183 (2014). A violation of the act requires (1) a private communication transmitted by a device, which was (2) intercepted by use of (3) a device designed to record and/or transmit, (4) without the consent of all parties to the private communication. RCW 9.73.030; State v. Christensen, 153 Wn.2d 186, 192, 102 P.3d 789 (2004).

Zonis argues that Steve intercepted private communications when he accessed stored communications between Todd and Courtney. He argues that

13

"when the statute is interpreted broadly, it may include any communication intentionally accessed by someone other than the intended recipient." He cites Roden, Christensen, and State v Faford, 128 Wn.2d 476, 910 P.2d 447 (1996).

In Roden, the State Supreme Court held that a law enforcement official illegally intercepted text messages when the detective seized an arrestee's phone and viewed text messages that the arrestee had not yet read. 179 Wn.2d at 906. The court stated, "Whether it is also a violation of the act to access text messages that have already been received by the intended recipient and remain in storage is not the question before us today." Id.

Zonis also cites Christensen and Faford. They are both inapposite. In Christensen, a mother purposefully intercepted her daughter's telephone conversation with her boyfriend and later testified against the boyfriend about what she overheard. 153 Wn.2d at 190. The mother intercepted the call by activating the speakerphone function at the base of the cordless phone. Id. It was undisputed that the mother listened to the private communication while the communication occurred. Id. at 190-91. In Faford, a neighbor eavesdropped on the defendants' cordless telephone calls 24 hours a day, 7 days a week over several months. 128 Wn.2d at 479. The court held that the neighbor's scanner interception of the defendants' cordless telephone conversations violated the privacy act. Id. at 488. Neither case involves someone reading or reviewing stored communications that had already been received by the intended recipient.

14

Additionally, Zonis argues that, despite whether stored communications come within the meaning of the statute, Steve "conceded that he used a [voice activated recorder] to record conversations between [Todd] and [Courtney]." For support, Zonis cites his own assertion at the summary judgment hearing that Steve used a voice activated recorder, as well as two online posts that he attributes to Steve. He argues that, even if there was a dispute about whether Steve actually recorded any communications, this was a disputed issue of material fact that should have gone to the jury.

Zonis's assertion at the summary judgment hearing that Steve used a voice activated recorder is not evidence that Steve did so. He lacked personal knowledge of the facts he alleged. And, in the online posts Zonis cites, the only "concession" about using a voice activated recorder or "VAR" is the statement, "Yeah, my VAR hasn't really worked. I thought I had it on the night she pushed me, but it didn't record anything." The other online post Zonis cites does not mention a voice activated recorder.

The trial court found, "While the record, taken in the light most favorable to the Zonises, reflects that Mr. Allen may have attempted to record conversations using a VAR, there is no evidence, disputed or otherwise, that Mr. Allen successfully used a VAR to record any conversation." The trial court correctly observed that there was no evidence that Allen used a voice activated recorder to record any conversation.

The trial court did not err in dismissing Zonis's wiretapping claim on summary judgment.

## II. Appeal to Jury's Emotions

Zonis argues that Allen intentionally inflamed, prejudiced, and misled the jury. He argues that counsel improperly encouraged the jury to award punitive damages during closing argument with the statements: "He's never, ever, ever going to stop. And someone needs to tell him to stop," "There is one verdict that will tell him to stop," and "You are their last hope." And, Zonis argues that Allen's counsel attempted to inflame the jury by repeatedly mentioning that Zonis did not testify.

CR 59(a)(2) permits a new trial because of misconduct of a prevailing party. Sommer v Dep't of Soc. & Health Servs., 104 Wn. App. 160, 170, 15 P.3d 664 (2001). Improper closing argument is one type of misconduct. Id at 170-71. Such misconduct must materially affect the substantial rights of the moving party. Id at 171. Absent an objection to counsel's remarks, the issue of misconduct cannot be raised for the first time in a motion for a new trial unless the misconduct is so flagrant that no instruction could have cured the prejudicial effect. Id. When defendants fail to object or to request a curative instruction, they do not preserve this argument for appeal, and this court need not further consider it. RAP 2.5(a); Collins v. Clark County Fire Dist. No. 5, 155 Wn. App. 48, 96, 231 P.3d 1211 (2010).

In Collins, the appellants argued that the plaintiff improperly appealed to the jury's sympathy, passion, and prejudice when counsel stated, "'[P]ut a value on [Plaintiffs'] suffering that other departments will look up and say, "We can't do that." Put a value on what they have experienced and compensate them to a level that says, "If you do this, serious consequences flow, and we compensate people as they are injured."'" 155 Wn. App. at 97 (alterations in original). The defendants did not object or request a curative instruction. Id. at 96. This court held that the comments were not so flagrant that no instruction could have cured the prejudicial effect. Id. at 97.

Likewise here, Zonis did not object to any portion of Allen's closing argument. And, when counsel stated that Zonis was "[n]ever, ever, ever going to stop," she was quoting exhibit 1037, which she had just played for the jury. During the playing of the recording, the last statement the jury heard was Zonis saying, "How does it feel to know that I'm never, ever, ever going to stop until you [expletive] admit what you did?" Further, telling the jury, "There is one verdict that will tell him to stop," and "You are their last hope" is not more prejudicial than counsel's comments in Collins. Zonis did not properly preserve this issue for review by timely objection and request for curative instruction. Zonis fails to show that Allen's comments were so flagrant that a curative instruction could not have cured any prejudice.

Finally, Zonis argues that it was misconduct when counsel referred to Todd's decision not to testify, especially when Allen "created the situation,"

17

because she used "more than [her] allotted days of testimony." Zonis asserts that Todd did not testify because the trial went longer than expected, and he was unable to take more time off work.

Again, Zonis did not object to Allen's comments that Todd did not testify during Allen's closing argument. When defendants fail to object or to request a curative instruction, they do not preserve an argument for appeal, and this court need not further consider it. RAP 2.5(a); Collins, 155 Wn. App. at 96.

Moreover, while a witness's refusal to testify cannot be used against him in a subsequent criminal proceeding, in a civil case the trier of facts is entitled to draw an inference from a party's refusal to testify. Ikeda v. Curtis, 43 Wn.2d 449, 458, 261 P.2d 684 (1953). And, the record here shows that Zonis had ample time to present testimony from other witnesses. Furthermore, the court offered Zonis the opportunity to continue the trial to the following Monday, but Zonis told the court that he was unable to get more time off of work and had already made travel arrangements. Todd's decision not to testify was his own, and counsel was not barred from commenting on it.

Zonis fails to show that Allen's comments were improper.

III.    Insurance Coverage

Zonis contends next that the trial court erred when it allowed Allen to mention Zonis's insurance in front of the jury, and that the instruction to the jury did not cure the prejudice.

18

Zonis did not object when Allen asked Jennifer about insurance, so this issue is not properly reserved for appeal. RAP 2 5(a). Even if we reached the issue, the evidence was not improperly admitted and the jury instruction was proper.

"Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully." ER 411. But, evidence of insurance may be admissible "when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness." Id.

Zonis challenges the following exchange that took place during Allen's cross-examination of Jennifer:

Q. Each of those law firms were working for you for free because they were provided by the insurance company, right?

A. No.

Q. Or at least three of them were, right?

A. They were not working for free. They were being paid by the insurance company who decided how much work they were going to do based on what the insurance company wanted to pay them.

. . . .

Q. And when the insurance companies were working handling your case, they were paying all the costs, right?

A. Yes, but they don't want to.

First, Jennifer had already discussed the insurance company paying for legal counsel during her direct examination  Therefore, Zonis had already opened the door for Allen to question Jennifer about the insurance covering litigation costs.

19

No. 76768-2-I/20

See Taylor v. Intuitive Surgical, Inc., 187 Wn.2d 743, 766, 389 P.3d 517 (2017) ("[W]hen one party opens the door to a topic, the other party may also introduce evidence in order to establish the truth for the jury.")

And, earlier during direct examination by Zonis of his expert witness, Jefford Englander, the following exchange took place:

Q. If I was to tell you that we're not wealthy people and that in [sic] $2500 is really a lot of money --

MR. BATEMAN. Objection, Your Honor.

THE COURT: Basis for your objection?

MR. BATEMAN: It's a statement that he's making to the jury. He's testifying about his finances.

THE COURT: I'm going to sustain.

BY MR. ZONIS:

Q. Due to the hourly rate that you charge, is it cost prohibitive for people that are not wealthy to have everything examined that they might want examined?

A. Certainly. The total cost of an examination, depending on the scope, can exceed 10, 15, $20,000 or more frankly, just depending on the type of the case. If that's not necessary, then

certainly if funds are not available, then it makes more sense to do less than more.

Q. That's for sure.

Thus, the purpose of Allen's questions during Jennifer's cross-examination was to rebut Zonis's claims that he lacked resources for his defense. Although this purpose may not fall squarely under one of the proper purposes listed under ER 411 ("proof of agency, ownership, or control, or bias or prejudice of a witness"), the

20

list is not exclusive. Terrell v. Hamilton, 190 Wn. App. 489, 500, 358 P.3d 453 (2015). Allowing the testimony was not error.

Zonis argues that the jury instruction did not cure the prejudice to Zonis from the error admitting the evidence. But, it was not error to admit the evidence so he cannot show prejudice of admitting it for the proper purpose of rebutting Jennifer's testimony. And, the trial court instructed the jury not to consider Zonis's insurance for an improper purpose:

> Whether or not a party has insurance, or any other source of recovery available, has no bearing on any issue that you must decide. You must not speculate about whether a party has insurance or other coverage or sources of available funds. You are not to make or decline to make any award, or increase or decrease any award, because you believe that a party may have medical insurance, liability insurance, workers' compensation, or some other form of compensation available. Even if there is insurance or other funding available to a party, the question of who pays or who reimburses whom would be decided in a different proceeding. Therefore, in your deliberations, do not discuss any matters such as insurance coverage or other possible sources of funding for any party. You are to consider only those questions that are given to you to decide in this case.

See Terrell, 190 Wn. App. at 501-02 (trial court's instructions that expressly and unequivocally prohibited the jury from relying on information about insurance for any improper purpose eliminated any potential prejudice).

The trial court did not abuse its discretion instructing the jury on the insurance evidence properly admitted.

21

IV.  Evidence

Zonis next makes a number of challenges to the trial court's decisions to admit and exclude documentary evidence.  He argues that the trial court abused its discretion in (1) admitting over 450 e-mails when the sender could not be verified, (2) excluding most of the e-mails before November 22, 2014 between Courtney and Todd, (3) admitting redacted police reports, and (4) excluding any reference to his loss of inheritance.

A.  Standard of Review

An appellate court reviews a trial court's evidentiary rulings for an abuse of discretion.  Gilmore v. Jefferson County Pub Transp Benefit Area, 190 Wn.2d 483, 494, 415 P.3d 212 (2018).  A court abuses its discretion when an order is manifestly unreasonable or based on untenable grounds  Id

B.  450 E-mails

Zonis argues that the trial court abused its discretion in admitting over 450 e-mails that he moved in limine to exclude.  He asserts that the "probative value of these e-mails was substantially outweighed by the risk of unfair prejudice when the sender could not be proved."

Authentication is a threshold requirement designed to assure that evidence is what it purports to be.  In re Det. of H.N , 188 Wn. App. 744, 751, 355 P.3d 294 (2015), review denied, 185 Wn.2d 1005, 366 P.3d 1244 (2016).  Under ER 901(a), "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter

22

in question is what its proponent claims " ER 901(b) illustrates some methods for authenticating e-mail:

> Testimony by a person with knowledge that (i) the email purports to be authored or created by the particular sender or the sender's agent; (ii) the email purports to be sent from an e-mail address associated with the particular sender or the sender's agent; and (iii) the appearance, contents, substance, internal patterns, or other distinctive characteristics of the e-mail, taken in conjunction with the circumstances, are sufficient to support a finding that the e-mail in question is what the proponent claims.

ER 901(b)(10).

In determining whether evidence has been authenticated, the trial court considers only the evidence offered by the proponent and disregards any contrary evidence offered by the opponent. State v. Young, 192 Wn. App. 850, 857, 369 P.3d 205, review denied, 185 Wn.2d 1042, 377 P.2d 761 (2016). In Young, the recipient of text messages had "personal knowledge" that the defendant sent the messages, because the defendant had put his number in the recipient's phone. Id. This court held that the recipient's personal knowledge, in tandem with the contents of the texts, was sufficient evidence to permit a reasonable trier of fact to find that the defendant sent the messages. Id. Further, this court held that the defendant was free to bring up any contrary evidence to establish that he was not the sender, but that evidence would go to weight, not admissibility. Id.

Here, Courtney testified that she knew Zonis was the sender of e-mails, because he was the only person who ever contacted her at a specific e-mail address that she created and gave to only Zonis. And, Courtney testified that the style of writing in the e-mails was consistent with how Zonis had written to her in

the past. As in Young, Courtney's personal knowledge, along with the contents of the e-mails, is sufficient authentication for a reasonable trier of fact to find that Zonis was the one sending the e-mails. And, Zonis's argument that Allen also wrote e-mails in a similar manner, specifically using all caps, is contrary evidence that goes to weight, but not authentication or admissibility.

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. ER 403.

Relying on State v. DeLeon, 185 Wn. App. 171, 189, 341 P.3d 315 (2014), rev'd, 185 Wn.2d 478, 374 P.3d 95 (2016), Zonis argues that the probative value of the e-mails was substantially outweighed by the risk of unfair prejudice. Specifically, he asserts that the e-mails were "inflammatory because of the explicit content," and that there was no nexus between his alleged conduct and the e-mails.

Zonis's reliance on DeLeon is misplaced, because there the issue was whether the trial court properly admitted evidence of gang affiliation under ER 404(b). 185 Wn. App. at 188. This court stated that, because of the inflammatory nature of gang evidence, to admit the evidence there must be a nexus between the crime and gang membership. Id. at 189. Here, the disputed e-mails were not evidence of prior bad acts, which is evidence that falls under ER 404(b). Instead, they were Allen's direct evidence of Zonis's conduct at issue in this case, different

24

forms of harassment, which was relevant to Allen's claim of intentional infliction of emotional distress. A proper nexus was established and the trial court properly balance probative value against unfair prejudice.

The trial court did not abuse its discretion when it admitted the e-mails.

C. E-mails before November 22, 2014

Zonis argues next that the trial court abused its discretion in excluding "almost all" e-mails between Courtney and Todd before November 22, 2014. Citing ER 403, he argues that the probative value of the e-mails substantially outweighed any prejudice.

ER 403 provides that relevant evidence can be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, among other dangers. State v. Beadle, 173 Wn.2d 97, 120, 265 P.3d 863 (2011). A danger of unfair prejudice exists "'[w]hen evidence is likely to stimulate an emotional response rather than a rational decision." Id. Trial courts have considerable discretion to consider the relevancy of evidence and to balance the probative value of the evidence against its possible prejudicial impact. State v. Barry, 184 Wn. App. 790, 801, 339 P.3d 200 (2014). Any error in a trial court's decision requires reversal only if, within reasonable probabilities, it materially affected the outcome of the trial. Id. at 802.

The trial court excluded many communications between Courtney and Todd pre-November 2014, because it found that they were incomplete under ER 106[4], irrelevant under ER 401, and overly prejudicial under ER 403.

Zonis argues that when the trial court excluded the bulk of the e-mails from Courtney about her feeling "repressed" and "her references to being sexual," the jury could not see why he and Jennifer reacted the way they did. He asserts that he was prejudiced because Allen moved to admit hundreds of e-mails that would not make sense to a jury and were out of context because of the e-mails the court excluded.

During argument on the motions in limine, the court asked Zonis if he had "more complete email strings." Zonis stated,

> Except the problem is the ones that I have in that format, I don't have the actual emails anymore. I printed out all of [sic] stuff that I had, and I really wasn't concerned with -- well, you know, when I -- when we got rid of the computer, I printed out all the stuff that I saved that was significant.
>
> I really didn't -- I didn't think my side of it was. The stuff that I saved in one format, yeah, there -- if I went back there might be some stuff but I don't really think. Nothing significant now because we printed out everything. I mean, we literally printed out everything we had.

Zonis's admission shows that the copies of e-mails he provided to the court were incomplete (portions deleted), because he did not think the other content was

---

[4]The trial court cites "ER 1006," but it most likely means ER 106. It states that the exhibits marked "are incomplete in that they do not include the full conversation and the lack of completeness creates a likelihood of confusion or undue prejudice." ER 106 pertains to incomplete writings or recorded statements, while ER 1006 controls the format of evidence.

26

relevant. The court did not abuse its discretion in excluding certain documents for being incomplete under ER 106.

The trial court also excluded some communications under ER 401, explaining, "While some context is relevant, multiple e-mails on the same topic or on a topic of limited probative value become cumulative." And, it excluded e-mails under ER 403, for being more prejudicial than probative, stating,

> In particular, for some of the e-mails that are sexual in nature, admitting the lengthy e-mail itself, with its graphic language and descriptions would be more prejudicial than probative, particularly when testimony can be elicited confirming, in general terms, that e-mails of this nature were sent. The specific language of these intimate conversations do not make any fact at issue more or less likely such that the prejudice outweighs any probative value.

Zonis argues that without the e-mails the trial court excluded, there was no context to his actions. But, the trial court permitted extensive testimony on the nature of the relationship between Courtney and Todd, and permitted Zonis to question Courtney about her relationship with her husband and her communication with Todd.

The trial court did not abuse its discretion in excluding e-mails before November 22, 2014.

D. Police Reports

Zonis contends next that the trial court abused its discretion by admitting exhibit seven—redacted police reports.

The trial court admitted the "crime stoppers" reports, not for the truth of the matter asserted, but to show that the reports existed. The admitted exhibit shows

that someone reported Steve for child abuse, and reported Steve and Courtney for selling illegal substances.

Zonis argues that the prejudice outweighed the probative value of these reports. He argues that the anonymous tips were prejudicial because of the implication that he did something nefarious, even though "none of these activities or crimes were directly connected" to him.

Detective Angie Galetti responded to the crime stoppers tip about Allen and contacted Allen. Galetti testified that Allen told her that Todd was harassing them. And, Galetti testified that Todd was a suspect because Allen named him and there was "a string of e-mails, phone calls, messages [sic]."

Courtney testified that there were a number of reasons why she believed Todd was the one who made the false reports. She explained that the anonymous tip came from someone who knew Allen's address and phone numbers, which Todd did And, whoever wrote the tips believed that Steve was still working at his previous employment, and Courtney testified that she did not think Todd knew that her husband had switched jobs. Also, the language of the report was reminiscent of language that she had seen Todd use in e-mails, such as the frequent use of the word "abuse" and the word "whore." Additionally, Courtney testified that she received an e-mail in October informing her that something was going to happen, and stating, "Look forward to prison, or something to that effect." Then, the police contacted Steve and Courtney because someone, under Steve's name, sent an e-mail threatening to shoot a daycare or a preschool.

28

Allen offered into evidence numerous e-mails that Courtney testified Todd wrote her, in which Todd threatened to get revenge on Allen. Courtney received these e-mails before the crime stopper reports were filed. Given the many instances of Todd's harassment and threats of revenge, and the absence of evidence implicating anyone else, the jury could infer that Todd wrote the crime stopper tips.

Evidence of police responding to the anonymous crime stoppers tips was highly relevant and probative to the harassment experienced by the Allens. Where the evidence is undeniably probative of a central issue in the case, the ability of the danger of unfair prejudice to substantially outweigh the probative force of the evidence is quite slim. Sisley v. Seattle Sch Dist No. 1, 171 Wn. App. 227, 232, 286 P.3d 974 (2012) (Sisley I).

The trial court did not err in admitting the crime stopper reports.

E. Loss of Inheritance

Zonis next challenges the trial court's exclusion of references to Zonis's loss of inheritance. He argues that the lost inheritance supported his claims of outrage and intrusion upon seclusion.

The tort of outrage requires the plaintiff to show: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) severe emotional distress on the part of the plaintiff. Reid v. Pierce County, 136 Wn.2d 195, 202, 961 P.2d 333 (1998).

Zonis argues that if he had been able to show that Allen's conduct "caused [Todd] to be disinherited, it would have been clear that the conduct was sufficiently outrageous and the jury could have presumed [he] suffered severe emotional distress." He also argues that if he had been able to present his father's full testimony, "it would have shown that [Steve]'s e-mail was the proximate cause of [Zonis]'s emotional suffering." Pointing to where the jury found Allen liable for intrusion upon seclusion, but did not award damages, he argues that it would have changed the jury's verdict.

No Washington court has adopted a cause of action for tortious interference with a right to inherit. In re Estate of Lowe, 191 Wn. App. 216, 236, 238, 361 P.3d 789 (2015), review denied, 185 Wn.2d 1019, 369 P.3d 500 (2016). It was not an error of law to decline to do so or to deny the admission of such evidence in this case.

In ruling that Zonis could not present evidence of a lost prospective inheritance, the trial court stated,

> This ruling does not preclude the Zonises from presenting evidence about the loss of family relationships, the nature of the family relationships before and after family members' receipt of the Allen e-mail, the sale of the family home without notice to them, the parents' move without notice to them and without providing an address, and the fact that Mr. Zonis had worked on the family home and was invested in it financially and emotionally. The only limitation is that they may not testify or offer evidence about wills, change of wills, anticipated inheritance or gifts, and loss of anticipated inheritance/gifts.

Zonis was free to present to the jury evidence of emotional suffering from the loss of family relationships, and did so. Jennifer testified that, because of the

e-mail that Steve sent to her parents-in-law, her and Todd's relationship with Todd's parents significantly deteriorated, to the point where his parents decided to move without telling them. His evidence merely failed to persuade the jury on the damages issue.

The trial court did not err in precluding Zonis from presenting evidence of a speculative loss of inheritance.

## V.   Posttrial Authentication

Zonis asserts next that the trial court abused its discretion in permitting Allen to cross-examine Jennifer using exhibit 597 when it was not properly authenticated or admitted. Zonis argues that the unauthenticated exhibit, an e-mail allegedly from Todd to Courtney, was particularly inflammatory. He points to two statements in the e-mail, "'I'm going to cripple him, and no piece of paper will stop that'" and "'Neighbor is having a 40th B-day [sic] party down the street, and I'm giving her the wife as a gift.'"[5]

At trial, the court mistakenly thought that exhibit 597 had been previously admitted. Pretrial, the exhibits had been marked, and many had been admitted. During cross-examination, Allen used exhibit 597 to question Jennifer, after the court stated that it had been admitted. Zonis objected, stating, "Assumes facts not in evidence. I want to renew my objection." The court responded, "It's been admitted over your objection, but the author has not. So I'm going to -- you may ask a question about if she knows who the author is." Allen then asked Jennifer

---

[5]The second statement about the neighbor's birthday party is actually from exhibit 466, not exhibit 597. Therefore, it is not relevant to Zonis's argument.

to confirm that the "from" designation of the e-mail said, "'I actually was your friend.'" Allen also asked Jennifer to confirm that the e-mail said, "I'm going to cripple him, and no piece of paper will stop that, all that will do is make it from a misdemeanor to a felony. Big deal." Jennifer confirmed what the e-mail stated. But, she did not agree that Todd had written the e-mail.

The record is not clear how it came to the court's attention posttrial that exhibit 597 had not been admitted. Two days after closing arguments, Allen filed Courtney's declaration stating that exhibit 597 was a true and accurate copy of an e-mail that she received. Zonis objected to the posttrial authentication of the e-mail, arguing that the court should have instructed the jury to not give the exhibit any weight or draw any conclusions from the evidence.

The court erred in permitting Allen to use exhibit 597 to cross-examine Jennifer when it had not been properly admitted  But, improper admission of evidence constitutes harmless error if the evidence is cumulative or of only minor significance in reference to the evidence as a whole. Hoskins v. Reich, 142 Wn. App. 557, 570-71, 174 P.3d 1250 (2008)

Zonis argues that exhibit 597 prejudiced him, because of the statement, "I'm going to cripple him, and no piece of paper will stop that." However, Steve had already testified that he received many harassing and threatening e-mails that he suspected came from Todd. The jury had already seen exhibit 237, an e-mail purportedly from Todd, in which he wrote, "I will not be happy that I'm hurting you as I destroy him." The e-mail also stated, "And I will. I still have a couple great

32

plays yet that will cost him some things he does care about, which is not you or Rand. He will have no job I will go after the property and his family as well." The jury heard that Steve successfully got a protection order against Todd. Steve testified that he later received an e-mail with a subject line, "'[O]ff to work little [expletive]. It will give us all more time with your wife.'" The e-mail also stated, "We will be there, maybe not everyday [sic], but as doing unto you as you have done unto others is now like a challenge for the whole website, you will never get rid of us." And, the jury heard about and saw exhibit 544, an e-mail with the subject, "They are going to hurt you. Maybe even kill you. You deserve it." And, Steve testified that he received another e-mail, exhibit 617, with the subject line, "I'm going to kill you." And, the same e-mail said, "And everything you love."

When the record is viewed as a whole, Allen's use of exhibit 597 before it had been properly authenticated and admitted is of minor significance. Zonis's assertion of prejudice is unavailing, and the use of exhibit 597 was harmless error.

VI.     Jury Instructions

Zonis argues that the trial court abused its discretion when it gave the jury misleading instructions. He argues that the instructions for the claim of outrage were misleading, because both parties brought the claim against each other and the instructions did not name the parties. He also argues that contributory negligence was not explained in a way that could be understood by the jury. And, he asserts that the affirmative defense instruction was difficult to decipher.

Jury instructions are generally sufficient if they are supported by the evidence, allow each party to argue its theory of the case, and, when read as a whole, properly inform the trier of fact of the applicable law. Fergen v. Sestero, 182 Wn.2d 794, 803, 346 P.3d 708 (2015). When this court reviews jury instructions, it looks to the jury instructions as a whole, to ensure that both parties are allowed to fairly state their case. Rekhter v. Dep't of Soc & Health Servs., 180 Wn.2d 102, 120, 323 P.3d 1036 (2014).

We review alleged errors in law in a trial court's jury instructions de novo. Fergen, 182 Wn.2d at 803. Absent a legal error, we review a trial court's decision regarding the specific language of the instruction for an abuse of discretion. In re Det. of Taylor-Rose, 199 Wn. App. 866, 880, 401 P.3d 357 (2017), review denied, 189 Wn.2d 1039, 409 P.3d 1070 (2018). A trial court has broad discretion in determining the wording of jury instructions. Id A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. Id

Zonis challenges a portion of instruction five, which stated,

For instance, because each party is bringing the one identical claim against the other, you may reach one of four results for each of those claims. That claim is.

1. Outrage, Intentional Infliction of Emotional Distress,

- You may find for the plaintiff on plaintiff's claim and against the defendant on defendant's counterclaim, or

- You may find for the defendant on defendant's counterclaim and against the plaintiff on plaintiff's claim, or

- You may find for the plaintiff on plaintiff's claim and for the defendant on defendant's counterclaim, or

34

• You may find against plaintiff on plaintiff's claim and against the defendant on defendant's counterclaim.

Zonis does not cite any authority for his assertion that a jury instruction is misleading because it calls the parties "plaintiff" and "defendant" rather than by their names. The Washington Pattern Jury Instructions routinely use "plaintiff" and "defendant" without indicating that these terms should be changed to the parties' names. See, e.g., 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 14.03.01, at 184 (6th ed. 2012) (WPI) (Outrage—Burden of Proof); WPI 41.01, at 393 (Two or More Plaintiffs—Separate Claims).

He also asserts that the affirmative defense instruction was "difficult to decipher" because it named the claims by only their number and not by the name of the cause of action. In the relevant part of instruction five, the trial court stated,

> (8)     Each party claims as an affirmative defense that the negligence of the other party was a proximate cause of the other party's own injuries and damages and was therefore contributory negligence [sic] (this affirmative defense relates to plaintiffs' claims 2 and 3 and defendants' claims 2 and 3).

In the same instruction, the court had listed the four claims Allen brought against Zonis and the three counterclaims Zonis brought against Allen. Each claim was numbered. Zonis does not cite any authority for his argument that referring to claims by their numbers in the same instruction is misleading.

And, although Zonis argues that the instructions did not properly explain contributory negligence, he has failed to show how they deviated from the pattern

instructions. In addition to the excerpt from instruction five above, the trial court instructed the jury,

> Negligence is the failure to exercise ordinary care   It is the doing of some act that a reasonably careful person would not do under the same or similar circumstances or the failure to do some act that a reasonably careful person would have done under the same or similar circumstances.

> Ordinary care means the care a reasonably careful person would exercise under the same or similar circumstances.

And, it instructed, "Contributory negligence is negligence on the part of a person claiming injury or damage that is a proximate cause of the injury or damage claimed."

When the jury instructions are read as a whole, it is clear that "plaintiff" meant Allen and "defendant" meant Zonis. It is also clear to which claims the trial court was referring when it did so by number in instruction five. The court's instructions on contributory negligence did not misstate the law.

Zonis has failed to show that the instructions did not allow each party to argue its theory of the case. The instructions properly informed the jury of the applicable law. The trial court did not abuse its discretion.

VII.    Phone Records

Zonis asserts next that the trial court abused its discretion when it did not order Allen to produce phone records until three weeks before trial.

On August 31, 2016, Zonis filed a motion to compel responses to discovery interrogatories and production requests. In the motion, Zonis asserted that Allen's

response to its production request for phone records was incomplete. The trial court ordered Allen to produce,

> [T]o the court copies of the call record information that has been provided to defendants to date, and shall additionally produce to the court an unredacted copy of all phone records in their possession or accessible to them which show calls responsive to this request. They shall additionally provide the court with a copy showing proposed redactions of unrelated call information. To the extent that telephone records are no longer available to plaintiffs, they shall produce a list of the dates, phone numbers and cellular provider.

In December 2016, in its second order regarding discovery, the trial court recognized that both parties had made claims about the other party's failure to comply with its previous discovery order. It stated that, moving forward, the parties may bring a motion to compel discovery or request to schedule a discovery conference. On February 21, 2017, following an in camera review, the trial court determined that Allen's redacted phone records were appropriate and ordered Allen to produce the records if she had not already done so.

Zonis has not cited any authority to support his assertion that the trial court abused its discretion in ordering Allen to produce the redacted phone records three weeks before trial, after a series of discovery orders. This court does not consider conclusory arguments unsupported by citation to authority. State v. Effinger, 194 Wn App. 554, 562, 375 P.3d 701 (2016), review denied, 187 Wn.2d 1008, 386 P.3d 1098 (2017); see RAP 10.3(a)(6).

Even if we were to consider Zonis's argument, the record shows that there were months of motions and orders regarding discovery. Zonis has failed to show how he was prejudiced by the trial court's in camera review and subsequent order

requiring Allen to produce the redacted phone records. Zonis argues that he asked for the records so that he could compare the ones he received from the phone company with the ones he received from Allen to see if Allen had fabricated the records. He asserts that, because of Allen's late disclosure of the phone records, he was "unable to subpoena the records [from the phone company] or conduct any kind of comparison." Zonis had the capability to subpoena the phone company at any point before he received the records from Allen. He does not explain why he needed the records from Allen before attempting to get them from the phone company.

The trial court did not abuse its discretion in admitting the phone records three weeks before trial.

VIII.  Time Allotment

Zonis asserts next that the "uneven time allotment" at trial violated his right to due process. He argues that because Allen used more than her allotted time, there was only time for Jennifer's testimony, and not Todd's.

Zonis cites the Fifth and Fourteenth Amendment of the United States Constitution, and Amunrud v. Board of Appeals, 158 Wn.2d 208, 216, 143 P.3d 571 (2006). The United States Constitution guarantees that federal and state governments will not deprive an individual of "life, liberty, or property, without due process of law." U.S. CONST. amends. V, XIV, § 1. "When a state seeks to deprive a person of a protected interest, procedural due process requires that an individual receive notice of the deprivation and an opportunity to be heard to guard

against erroneous deprivation." Amunrud, 158 Wn.2d at 216. The opportunity to be heard must be at a meaningful time and in a meaningful manner, appropriate to the case. Id.

Amunrud concerns whether the appellant was given a meaningful opportunity to be heard before and after the suspension of his commercial driver's license consistent with procedural due process. Id. at 211. In Amunrud, the court was unequivocal that driver's licenses are property interests protected by procedural due process. Id at 216. Here, Zonis does not cite to any Washington case that addresses whether due process requires equal time at trial.

Allen asserts that no Washington court has addressed this issue. Citing Jalbert v. Eagle Rigid Spans, Inc., 2017 ND 50, ¶¶ 10-13, 891 N.W.2d 135 (2017), Allen argues that the North Dakota Supreme Court rejected a similar due process argument. In Jalbert, the court stated that, because the appellant did not make an offer of proof of the specific testimony excluded by time restraints, it was unable to review whether the party had been prejudiced. Id. at ¶ 13. The court concluded that, based on the record, the district court did not abuse its discretion in allocating time during the trial. Id

Likewise here, Zonis does not indicate what specific testimony Todd would have provided that the time constraints prevented. He asserts that Todd "was the only defense witness with actual knowledge of what transpired between him and [Courtney]." But, Todd was free to testify. Instead, Zonis called Jennifer and expert witness Englander to testify, and read Larry Zonis's deposition testimony.

39

Further, the trial court offered Zonis the opportunity to continue the trial to Monday, April 3, 2017, but Zonis declined on the basis that he already had travel arrangements to leave Seattle.

Finally, it is not clear from the record that there was a significant disparity in the time the parties used at trial. At the end of the trial day on Tuesday, March 28, 2017, the trial court summarized the time the parties had used so far, stating,

> As of the end of today, the Plaintiffs have spent 332 minutes on direct and the Defendants have spent 208 minutes examining witnesses. For example, for Ms. Allen the Plaintiffs [sic] spent a total of 195 minutes 160 minutes on Thursday and 35 minutes on Monday. And then there was the Defendant spent 167 minutes cross-examining her. I have more detail, but the upshot is that at this point we have 332 minutes for the Plaintiffs and 290 for the Defendants.

There was not a great difference between 332 minutes total for Allen and 290 minutes total for Zonis to that point. And, the trial court made note of the parties' use of time, and even offered to continue the trial for an extra day for Zonis to continue, but Zonis had already made travel plans

The following day, Allen called only one witness, who Zonis cross-examined, and to whom the court asked questions posed by the jury. Afterwards, Zonis called two witnesses, Englander and Jennifer. On the last day of the trial, Zonis continued Jennifer's direct examination and read Larry Zonis's deposition before resting. Then, the trial court instructed the jury and both parties gave closing statements. Todd and Jennifer both participated as counsel, and Jennifer testified for Zonis. Therefore, it is inaccurate to conclude that the time allotment was unfair.

40

Based on this record, the trial court did not abuse its discretion in allocating time during trial.

IX.    Cumulative Error

Zonis argues next that cumulative error denied him the right to a fair trial.

Zonis does not provide any authority holding that the cumulative error doctrine applies in a civil case. He cites the unpublished portions of H.B.H. v. State, 197 Wn. App. 77, 387 P.3d 1093 (2016), aff'd, ___ Wn.2d ___, 429 P.3d 484 (2018), and Kave v McIntosh Ridge Primary Road Association, 198 Wn. App. 812, 394 P.3d 446 (2017) as two civil cases in which this court has discussed the doctrine. In both cases, this court states that there is no authority to apply the cumulative error doctrine in a civil case. HBH, 197 Wn. App. ¶ 68 (unpublished in relevant part) ("The children cite no authority for applying the cumulative error doctrine in a civil case."); Kave, 198 Wn. App. ¶ 68 (unpublished in relevant part) ("The Kaves do not provide any authority that cumulative error doctrine applies in a civil case "). Even if the cumulative error doctrine applies in civil cases, Zonis has failed to show that he was denied a fair trial.

Zonis's cumulative error argument fails.

X.    Final Judgment

Finally, Zonis argues that the trial court erred in naming Jennifer Zonis as a party on the final judgment.

Citing Wilcox v. Basehore, 187 Wn.2d 772, 788, 389 P.3d 531 (2017), Allen argues that Zonis cannot challenge the trial court's inclusion of the marital

community in the judgment because Zonis did not object below. Wilcox cites RAP

2.5(a), which provides that a court may refuse to review any claim of error that was

not raised in the trial court. Id. at 788. The rule is discretionary, rather than

mandatory. Roberson v. Perez, 156 Wn.2d 33, 39, 123 P.3d 844 (2005). And,

while Zonis did not make a formal objection, he did raise the issue below when

discussing jury instructions:

> MR. ZONIS: . . . I'm looking at their claims. It says, question one, "Electronic impersonation. Did Todd or Jennifer Zonis."
>
> "Jennifer" does not appear."
>
> THE COURT: . . . That's actually a global question I had. There are a number of places where it said "Todd or Jennifer Zonis." . . . And then it occurred to me somewhere through that . . . maybe it shouldn't be saying "or Jennifer Zonis" at all
>
> So I think in the neutral statement of the case we had agreed that that is how it was going to be.
>
> MR. SHAW: You're right. These were written before we did the neutral statement. And my analysis was because "the marital community of Todd and Jennifer" is there and people had joint access to a computer doing things --
>
> MR. ZONIS: That's not the cause of action.
>
> MR. SHAW: I'm thinking about the liability side of that. At some point we may not be able to prove whose fingers were on the keys, if it came from the house.

Given this record and the discretionary nature of RAP 2.5(a), this court may

address Zonis's argument on appeal.

Whether a marital community is liable for the intentional tort of one of its

members is a mixed question of law and fact. Clayton v. Wilson, 168 Wn.2d 57,

42

62, 227 P.3d 278 (2010). This court reviews mixed questions of law and fact de novo. Id

The community is not liable for the torts of the husband, unless the act constituting the wrong either (1) results or is intended to result in a benefit to the community or (2) is committed in the prosecution of the business of the community. Id. at 63. In Clayton, the community was liable for the husband's sexual abuse of a young boy, because the husband committed the intentional tort during the course of managing the family business. Id at 65.

Zonis argues that this case is distinguishable because, if Allen's allegations are true, then Todd is the tortfeasor, and there was no testimony that any of these torts benefited the community or that Todd committed them during the course of managing the community business.

Allen asserts that Todd intended his actions to benefit the community. There are a number of exhibits which indicate that Todd's actions were in retaliation to actions he perceived as hurting his family. One e-mail to Courtney states,

> [T]hat means my wife who is twice the mother you are remains childless for a year for NOTHING! Thanks for repaying my kindness with all this. And [I] am going to make sure the revenge [I] take will be long, drawn out, and painful. . . . But Jen already has dibs on you! . . . . Everyone in your life will suffer because of you like mine did.

In another e-mail to Courtney, he says, "HOWEVER, FOR THE SAME REASON THAT I AM GOING AFTER HIM, BECAUSE HE ATTACKED MY FRIENDS, FAMILY, AND PEOPLE I LOVE, I WILL DO SO GLADLY!!!" Another e-mail to

43

Courtney states, "See what happens when you constantly lie, and let my wife get harmed like that?" These are just a few examples of numerous exhibits which indicate that Todd's actions were intended to benefit the marital community.

Further, Jennifer participated as counsel for Zonis. She extensively cross-examined Courtney. Given the evidence showing that Todd intended his actions to benefit the marital community, Jennifer's own actions on behalf of the community, the lack of objection to Jennifer and the marital community being named as parties, and Jennifer's participation in the trial, the trial court did not err in including the marital community in the judgment.

We affirm.

Appelwick, C.J.

WE CONCUR:

Leach, J.                    Dwyer, J.